James P. D'ANGELO, Receiver for Papantla Royalties Corporation, a dissolved Delaware Corporation, Plaintiff,

v.

PETROLEOS MEXICANOS, a decentralized Institution pertaining to the Republic of Mexico, Defendant.

Civ. A. No. 74-17.

United States District Court,
D. Delaware.

July 16, 1975.

William H. Bennethum, III, Wilmington, Del., for plaintiff.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., for defendant; Timothy P. Walsh of Hardin, Hess & Walsh, New York City, of counsel.

## OPINION

STEEL, Senior District Judge:

Plaintiff, James P. D'Angelo, is the receiver of Papantla Royalties Corporation ("Papantla"), a dissolved Delaware corporation, appointed by order dated December 21, 1956, of the Court of Chancery of Delaware. He has brought an action against the defendant, Petroleos Mexicanos, a decentralized governmental agency of the Republic of Mexico, a non-resident of the United States, for an order requiring the defendant to account to the plaintiff for oil produced from wells in Mexico in which he claims that Papantla and plaintiff have royalty or participation interests. The complaint alleges that the defendant was

created by the Mexican government to manage and handle privately owned oil properties existing in Mexico which had been seized on or about March 18, 1938, for the purpose of nationalizing the oil industry. The complaint alleges that at the time, Papantla was the owner of certain oil royalties and participation rights in certain of the properties so expropriated by the Mexican government, and that those rights were never expropriated by the defendant or the Republic of Mexico. The amount in controversy is alleged to exceed the sum of $10,000, exclusive of interest and costs. The action is between a citizen of a state of the United States and a citizen of a foreign state, and is within the jurisdiction conferred by 28 U.S.C. § 1332(a)(2).

Following a determination by the Court that the defendant was subject to its quasi in rem jurisdiction by virtue of a sequestration of its property, *D'Angelo v. Petroleos Mexicanos*, 378 F.Supp. 1034 (D.Del.1974), the defendant appeared generally and answered the complaint. The case is now before the Court upon cross motions for summary judgment based upon the pleadings, depositions, answers to interrogatories, admissions on file and affidavits.

Defendant's motions are based upon the grounds that (a) the act of state doctrine precludes the Court from considering the merits of plaintiff's claim, (b) the statute of limitations and/or laches bars the claim, and (c) the doctrine of forum non conveniens requires a dismissal of the action. Plaintiff seeks a summary judgment on the basis of the record.

*Defendant's Motions*

*Act of State Doctrine*

A large part of the evidence which plaintiff relies upon in resisting defendant's motion for summary judgment rests upon the testimony of one Roscoe B. Gaither, Esquire, which at this juncture must be accepted as true.[1] Under Mexican law prior to the adoption of the Constitution of 1917, the owner of the surface of land owned the oil in the subsoil.[2] This was changed by Article 27 of the Mexican Constitution of 1917. This Article provided that the Mexican nation owned the oil in the subsoil and permitted exploitation only in accordance with ". . . concessions [granted] by the [Mexican] Federal Government, to private individuals or civil or comercial (sic) corporations that are constituted according to Mexican laws. . . ."[3] Nationals of foreign countries who had been in Mexico and developed the oil prior to the adoption of the 1917 Constitution protested against the non-recognition of the rights which they had acquired before the enactment of the Constitution. Because of the protests of foreign governments, including Great Britain, Holland and the United States, to the deprivation of rights in oil acquired by their nationals prior to 1917, meetings were held between them and representatives of the Mexican government in Mexico City beginning on May 15, 1923. These were known as the Bucareli Conferences. As a result a number of agreements were entered into between the Mexican government and certain of the foreign nations, including the United States, repre-

---

1. Gaither was the "father" of Papantla and its chief spokesman. He was a man of considerable distinction. He became a member of the New York bar in 1924 and specialized in Latin-American law, particularly in Mexican law. He spoke Spanish fluently since boyhood as a result of having had Mexican nurses, and French as a result of a year spent at the Sorbonne. Some part of his adult life had been spent working in Venezuela and Mexico for oil companies.

2. See Mining Code of the United Mexican States. Mexico 22 November 1884, with slight variation in terminology but not in substance in the Mining Law of United Mexican States. June 4, 1892 and the Mining Law of the United Mexican States. Mexico 25 November 1909. See Doc. 63A.

3. The Mexican government, as owner of oil in the subsoil, leased the subsoil rights to the oil companies for limited periods of time. These were known as "ordinary concessions" to distinguish them from "confirmatory concessions."

sented by Messrs. Payne and Warren. The United States' agreement, known as the Payne-Warren Agreement, gave recognition to the pre-constitutional rights of the landowners, through many of whom rights of foreign nationals were derived. This agreement was confirmed by the Petroleum Law of December 26, 1925. Thus, Mexican law was changed so that landowners who were able to prove to the satisfaction of the Mexican government that they had intended to utilize the oil in the subsoil prior to May 1, 1917, could acquire a confirmatory concession which permitted exploitation for up to 50 years. A decree dated January 3, 1928, modified this law and made the concessions good for an unlimited period of time.

The title of Papantla to the "royalties and participation rights" upon which plaintiff, as Papantla's receiver, based his claim derived from confirmatory concessions. Acting under powers of attorney from numerous landowners, Gaither had filed with the head of the legal department of the Department of Economy of Mexico, (1) proof of title of certain landowners claiming the subsoil rights, and (2) proof positive of their intention prior to 1917 to use the oil in the subsoil. As a result of this action 576 confirmatory concessions were acquired by Papantla, as appears from the records in the defendant's own files.

After the confirmatory concessions were obtained, Gaither made arrangements with the landowners so as to permit the development by the big oil companies of the concessions which he had obtained for the landowners. About two-thirds of the 576 confirmatory concessions were leased or sold to the oil companies.[4]

Two of the major deals which Gaither made were with Sinclair Oil Company and Aguila, a Dutch Shell subsidiary. Under the contracts which Gaither made with them, Shell was given an 89% interest in the oil produced and Sinclair an interest of 87½%. A 5% interest was reserved to the landowners, 3% was reserved to intermediaries who had assisted Gaither as interpreters or guides in making contact with the Indian landowners, and the remaining interest was reserved for Gaither and by him assigned to Papantla.

By a presidential decree of March 18, 1938, certain properties of specified oil companies were expropriated. The decree reads:

"Decree which expropriates in favor of the Patrimony of the Nation, personal and real properties belonging to the oil companies who refused to accept the decision of the 18th of December of 1937 of group number 7 of the Federal Board of Conciliation and Arbitration.

There is expropriated by reason of public utility in favor of the Nation; the machinery, installations, buildings, —pipelines, refineries, storage tanks, ways of communication, tank cars, distribution stations, embarcations and all of the other personal property and real property of: Compania Mexicana de Petroleo El Aguila, S.A., Compania Naviera De San Cristobal, Compania Naviera San Ricardo, S.A.; Suasteca Petroleum Company; Mexican Sinclair Petroleum Corporation; Stanford y Company Sucesores, S. en C.; Penn Mex Fuel Company, Sinclair Oil, Pierce Oil Company; Richmond Petroleum Company de Mexico; Compania Petrolera el Agwi, S.A.; Compania de Gas y Combustible Imperio; Consolidated Oil Company of Mexico; Compania Mexicana de Vapores San Antonio, S.A.; Sabalo Transportation Company; Clarita, S.A. y Cacalilao, S.A., in amounts as may be necessary in the opinion of the Secretariat of National Economy for the discovery, production, transportation, storage, refinery and distribution of the petroleum industry."

---

4. Confirmatory concessions which were not leased or sold were retained by Tagin Company and are of no concern in this litigation.

Among the 17 companies specified in the decree were those which had acquired or leased from Gaither on behalf of Papantla interests in the confirmatory concessions, which Gaither had acquired for the landowners.

Following the expropriation the defendant was formed, and through it Mexico went into the oil business, carrying on production, transportation, refining, manufacturing and the sale and export of petroleum products in and from Mexico.

By paragraph 5 of its answer to the complaint the defendant has "[a]dmitted that prior to the Mexican expropriation in 1938 Papantla owned certain oil royalties or participation rights". However, the same paragraph denies that "after the Mexican expropriation in 1938 Papantla had any right to oil royalties or participation rights and therefore denie[s] that any money is owed to Papantla or to plaintiff." [5] In short, defendant contends that the rights of the holders of the confirmatory concessions and of persons having any interest therein, including Papantla, were extinguished by the Mexican expropriation in 1938.

On the other hand, plaintiff maintains that the expropriation decree related solely to the physical properties owned by the 17 oil companies specified in the decree and to their interests in any confirmatory concessions[6] but had nothing to do with the interests which Papantla and others had retained in those concessions.

Plaintiff asserts that the confirmatory concessions were a "breed apart" and were dealt with by a "treaty agreement" between the United States and Mexico, and since the expropriation decree was silent as to the interest held by Papantla and others it was never intended to extinguish those rights. By "treaty agreement" plaintiff apparently means the Payne-Warren Agreement stemming from the Bucareli Conferences.

Defendant contends that under the act of state doctrine the Court should refrain from adjudicating the issue thus posed by plaintiff. That doctrine found early expression in *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), where Chief Justice Fuller said for a unanimous Court:

> "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." *Id.* at 252, 18 S.Ct. at 84.

No subsequent case "in which the act of state doctrine was directly or peripherally involved manifest[s] any retreat from *Underhill.*" *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1963). In the later case of *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 763, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), the Court referred to the above quotation from *Underhill* as the "'classic American statement' of the [act of state] doctrine. . . ." It said that it was a doctrine "judicially created to effectuate general notions of comity among nations and among the respective branches of the Federal Government." *Id.* at 762, 92 S.Ct. at 1811.

In considering whether the act of state doctrine has any relevance to the present case it is important to distinguish between the type of issue which

---

5. In the complaint plaintiff claims to be the owner of "royalties or participation rights" in Mexican oil. Much of Gaither's deposition refers to "confirmatory concessions". For purposes of the act of state motion neither of the parties has made a distinction between "royalties or participation interests" and the "confirmatory concessions".

6. At page 75 of Gaither's deposition he said: (Doc. 63A)

"The Shell company had only eighty-nine percent. In the case of the Sinclair company, they had only eight-seven and a half. That could be expropriated. But not the royalty belonging to Papantla Royalties Corporation."

lies at its heart, and the one of present concern which is beyond its purview. The question of the *validity* of the expropriation decree is *not* here in issue. The *validity* of an expropriation decree or other governmental act *was* the subject of most of the cases in which an act of state was held to preclude judicial challenge. Plaintiff does not assail the *validity* of the expropriation decree to divest owners of whatever property the decree was intended to expropriate. Gaither, when asked whether Papantla claimed that the 1938 expropriation itself was unlawful, replied: "Far be it from me to disagree with the Supreme Court of Mexico which claimed that it was lawful".[7] Plaintiff rests his case not upon any claim of invalidity of the decree but upon the argument that properly *interpreted* the decree did not encompass any of the confirmatory concessions or interests therein other than those owned or leased to the 17 oil companies; in short, plaintiff argues that Papantla's interests in the concessions were beyond the scope of the decree and that they survived it. The issue then is one which goes to the scope or meaning of the decree, not to its validity; that is, whether or not there was in fact an act of state which affected Papantla's interests.

This is a significant distinction. Whereas courts have interposed the doctrine to prevent a judicial adjudication of the validity of a foreign governmental act, they have not done so when a question concerns the interpretation of the act.

In *Banco Nacional de Cuba v. Sabbatino*,[8] the District Court had before it both questions of interpretation and validity of an act of state. The defendant asserted that the Cuban act of expropriation of sugar was not sufficiently broad to embrace a contractual right in sugar against the contention of the plaintiff to the contrary. The Court first determined the construction question, rejecting the defendant's position, 193 F.Supp. at 378–79. Only then did it proceed to discuss the application of the act of state doctrine in its relationship to plaintiff's attack upon the validity of the decree and held that since the decree was "a patent violation of international law, this court [would] not enforce it," 193 F.Supp. at 386. The decision was affirmed by the Second Circuit Court of Appeals and ultimately was decided by the Supreme Court. There the Supreme Court reversed the lower court's decision with respect to the validity of the decree and held that the act of state doctrine precluded judicial inquiry into the validity of the decree and necessitated its enforcement. However, the Court approved the action of the lower courts in interpreting the scope of the decree. By affirming the decision as to the construction issue, the Supreme Court [9] and Court of Appeals,[10] impliedly held that the act of state doctrine did not preclude judicial determination of such issues.

In *Shapleigh v. Mier*, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937) the question was whether the title of plaintiff to property had been divested by a Mexican expropriation decree. The Court held that the effect of the decree was to divest plaintiff of his title to the property. The legality of the decree was not in issue nor discussed. Noting the distinction between the efficacy of an expropriation decree and its validity, Mr. Jus-

---

7. However, Gaither has been critical of the expropriation nevertheless. In his book "Expropriation in Mexico, The Facts and The Law", Gaither suggests that the Supreme Court of Mexico "denied justice" when it sustained the expropriation. The opinion of the Supreme Court of Mexico which Gaither refers to is not a part of the record.

8. 193 F.Supp. 375 (S.D.N.Y.1961), *affd.* 307 F.2d 845 (2d Cir. 1962), *revd.* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

9. 376 U.S. at 413, 84 S.Ct. 923.

10. 307 F.2d at 854, n. 5.

tice Cardozo, speaking for a unanimous Court, said:

> "The question is not here whether the proceeding was so conducted as to be a wrong to our nationals under the doctrines of international law. . . . What concerns us here and now is the efficacy of the decree under the land law of Mexico at the date of its proclamation to extinguish hostile claims of ownership and pass the title to another." *Id.* at 471, 57 S.Ct. at 262.

Since the validity of the decree was not questioned but only its effect, the Court determined the latter question without discussing the act of state doctrine.

Compare *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942) where the question was whether a Russian decree of nationalization of insurance companies was intended to have an extraterritorial effect on their funds in the United States. The Commissariat for Justice of the R.S.F.S.R. gave his opinion that the decree was intended to have such an effect. The Court held that "this official declaration was conclusive", as to what, as a matter of Russian law, the decree was intended to accomplish. *Id.* at 220, 62 S.Ct. 552. The Court's opinion did not discuss the act of state doctrine. In the case at bar, so far as the record discloses, there has been "no official declaration" by the Republic of Mexico as to whether the expropriation decree of 1938 was intended to divest plaintiff and others similarly situated of their rights in the confirmatory concessions and interests thereunder. Had the record revealed such an "official declaration" such interpretation might perhaps be deemed to constitute an act of state which would preclude this Court from making an independent examination of the effect of the decree. This, however, is not presently decided.

Defendant's motion for summary judgment based upon the act of state doctrine will be denied.

*Statute of Limitations and/or Laches*

■ Where the jurisdiction of a federal court is invoked upon the basis of diversity of citizenship, it will apply the period of limitation which a similar state forum would apply to the end that the effect of the decision will be no different than it would have been if the action had been brought in the state court. *Guaranty Trust Company v. York,* 326 U.S. 99, 110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Defendant concedes that the same rule applies when the jurisdiction of the federal court rests upon "alienage", (D.O.B., Doc. 62, p. 16). This would seem to be true where, as here, the claims are not federal in their origin.

■ The question is posed, therefore, whether or not a Delaware state court would hold the action to be time barred. The complaint sounds in equity, that is, it seeks an accounting against the defendant.[11] However, insofar as it seeks monetary relief it is an action which is analogous to an action at law for a money judgment. *Artesian Water Co. v. Lynch,* 283 A.2d 690 (Del.Ch. 1971). In *Bokat v. Getty Oil Co.,* 262 A.2d 246 (Del.1970) the Court said:

> "[w]hen the relief sought in Chancery is legal in nature, it is clear that Chancery will apply the statute of limitations rather than the equitable doctrine of laches. *Perkins v. Cartmell, Adm'r,* 4 Harr. 270; *Cochran v. F. H. Smith Co.,* 20 Del.Ch. 159, 174 A. 119 [(1934)]". *Id.* at 251.

Accordingly, the statute of limitations rather than the doctrine of laches is controlling.

The defendant contends that this is an action for a debt and as such is barred by the Delaware three year statute of

---

11. Plaintiff has invoked a jurisdiction traditionally possessed by the Delaware Court of Chancery and has utilized the sequestration procedure which is available only in the Court of Chancery.

limitations found in 10 Del.C. § 8106 (1974), or alternatively, if the Delaware "borrowing" statute is applicable, by the Mexican statute of limitations which defendant contends is ten years. Thus, defendant argues that under either the Delaware or Mexican limitations law, the action is time barred. The Delaware borrowing statute, 10 Del.C. § 8121 (1974) provides:

Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the explanation of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply. (46 Del.Laws, c. 254, § 1; 10 Del.C.1953, § 8120.)

▮ Papantla, which originally possessed the cause of action, is a Delaware corporation and plaintiff D'Angelo is a resident of Delaware and a Receiver appointed by the Court of Chancery of Delaware. Accordingly, the last sentence in the borrowing statute makes Delaware limitations law controlling rather than Mexican law.

Section 8106, which contains the three year period of limitation relied upon by the defendant, has application only to a "debt not evidenced by a record or by an instrument under seal". Plaintiff contends that the confirmatory concessions or plaintiff's interest therein which are the basis of his claim are evidenced by records in the office of the defendant and hence the indebtedness which the defendant owes to him is evidenced "by a record" within the meaning of Delaware law. Since Delaware has no statute of limitations dealing with a debt "evidenced by a record", plaintiff, relying upon *Farmers Bank v. Gardner's Adm'rs*, 4 Harr. 430 (Super.Ct.1846) argues that the common law rebuttal presumption of payment or satisfaction after the lapse of twenty years alone defines the applicable time limitation. He claims that statements in the Gaither deposition concerning promises by the defendant to pay the plaintiff, and indeed some small payments which the defendant actually made to plaintiff, rebut the presumption.

▮ The record discloses that the payments which were made to plaintiff were minimal and defendant points to evidence suggesting that they were made because of the nuisance value of the claims rather than in recognition of their validity. These are factual issues, which if relevant, can be resolved only after a trial. The same thing is true of the issue whether the claims are "evidenced by a record" within the meaning and intendment of the Delaware law Thus, on this ground alone, summary judgment based upon the statute of limitations and/or laches should be denied. Moreover, even assuming that the three year period controls, as urged by defendant, other legal considerations preclude the grant of summary judgment.

When plaintiff's cause of action against the defendant arose the defendant was a foreign corporation. It never qualified to do business in Delaware as a foreign corporation.[12] As an unqualified foreign corporation defendant was not subject to in personam process served upon the Secretary of State under 8 Del.C. § 382 (1974) since the transaction upon which plaintiff's claim is based did not arise in Delaware.

12. This was ascertained by the Court from Miss Jackie George of the Secretary of State's Office. While recognizing that it is somewhat irregular to go outside of the record, the Court felt that it was warranted in doing so to put at rest one phase of this litigation. If the defendant wishes to contest the accuracy of the information which the Court received from the Secretary of State's Office, it may do so by filing an appropriate motion.

These circumstances focus attention on 10 Del.C. § 8117 (1974) which reads:

"If at the time when a cause of action accrues against any person, he is out of the State, the action may be commenced, within the time limited therefor in this chapter, after such person comes into the State in such manner that by reasonable diligence, he may be served with process. If, after a cause of action shall have accrued against any person, he departs from and resides or remains out of the State, the time of his absence until he shall have returned into the State in the manner provided in this section, shall not be taken as any part of the time limited for the commencement of the action. (Code 1852, § 2751; 20 Del.Laws, c. 594; 25 Del. Laws, c. 234; Code 1915, § 4680; Code 1935, § 5138; 10 Del.C.1953, § 8116.)"

The relevance of this provision to the instant case requires consideration in the light of *Glassberg v. Boyd*, 35 Del. Ch. 293, 116 A.2d 711 (1955). *Glassberg* held that the tolling provisions of the then section 8116 of the Code of 1953 (now section 8117) could not be read into the "borrowing statute", then section 8120 of the Code of 1953, (now section 8121). This was because, the Court said, section 8120 was enacted in 1947, long after section 8116 was passed, and since section 8120 was passed with reference to a specific subject—out of state causes of action—and made no mention of the pre-existing savings clause in section 8116, the Legislature must have intended section 8120 to exclude the savings clause of section 8116. The action in *Glassberg* was begun by a non-resident. Because of this the decision is without pertinence to the instant action where the plaintiff and his predecessor were and are Delaware residents. In *Pack v. Beech Aircraft Corp.*, 50 Del.

413, 132 A.2d 54 (1957), the Court in referring to the last sentence in the Delaware borrowing statute, said "the common law rule that the *lex fori* governs the matter of limitation of actions [as to a resident plaintiff] is left in full force" 132 A.2d at 57, and the rights of Delaware plaintiffs "shall be unaffected by the change", *id.*, that is, the enactment of the borrowing statute (46 Del. Laws, c. 254, § 1 (1947)).

Prior to the enactment of the borrowing statute the law in Delaware was clear. Chapter 123 of the Code of 1852 is entitled "Limitation of Personal Actions". Section 6 of Chapter 123, Del. Rev.Stats. § 2742 (1852), is the forerunner of the three year statute of limitations presently found at 10 Del.C. § 8106 (1974). Section 14 of Chapter 123, Del.Rev.Stats. § 2751 (1852) is the historical counterpart of the present tolling provision found in 10 Del.C. § 8117 (1974) which is operative when a defendant is absent from the state. For over 120 years a tolling provision like section 8117 has been part and parcel of the three years statute of limitations.[13] There is no reason to believe that the last sentence in the borrowing statute, section 8121, which simply had the effect of perpetrating prior law for a resident plaintiff, was intended to deprive him of the tolling provisions which he would otherwise have had.

The defendant has never been in the state of Delaware and personal service upon it has always been impossible. A number of cases have stated, however, that so long as the equivalent of personal service can be obtained upon a non-resident the tolling provisions of 10 Del.C. § 8121 (1974) are not applicable. See, for instance, *Hurwitch v. Adams*, 52 Del. 247, 155 A.2d 591 (1959) (service possible under Non-Resident Motorist Act, 10 Del.C. § 3112 (1974)); *Molitor, Inc. v. Feinberg*, 258 A.2d 295 (Del.

---

13. This distinguishes the case of *Lewis v. Pawnee Bill's Wild West Co.*, 22 Del. 316, 66 A. 471 (1907) wherein it was held that the tolling provisions of Chapter 123 of the 1852 Code had no reference to the one year statute of limitations application to personal injury actions, since the latter was not passed until 1897 (20 Del.Laws, c. 594, § 1 (1897)).

Super.Ct.1969) (service on Non-Resident Doing Business in the State, 10 Del.C. § 3104 (1974)); *Klein v. Lionel Corp.*, 130 F.Supp. 725 (D.Del.1955) (long arm service under the Clayton Act, 15 U.S.C. § 22 (1973)); *Wilkes v. Wrangell & Co.*, 293 F.Supp. 522 (D.Del.1968) (service under admiralty law by attachment of vessel). In all of these cases, however, the service was the equivalent to personal service on the defendant because in each case the service was sufficient to have permitted the Court to have rendered an in personam judgment against the defendant.

Defendant argues that since the tolling statute has been held to be inapplicable to an absent defendant who is otherwise subject to service, it should likewise be held to be without relevance in this case in view of the fact that quasi in rem process, that is foreign attachment or sequestration, could have been availed of. It points to *Hurwitch v. Adams, supra; Lewis v. Pawnee Bill's Wild West Co., supra*; and *Bokat v. Getty Oil Co., supra*, as supporting this view.

In *Lewis v. Pawnee Bill's Wild West Co., supra*, the action for personal injuries was begun against a foreign corporation by foreign attachment more than one year (the period of limitation) after the cause of action accrued, but within one year after the defendant first brought property into the state. At the time there was no tolling provision relating to personal injury claims [14] and the Court held that the action was barred by the one year statute. It said:

"In the present case the plaintiff might have commenced her action by foreign attachment within one year from the time her cause of action accrued, and kept it alive by alias and pluries writs until the defendant

brought its property within reach of process, which it did in about two years after the injuries complained of." 66 A. at 474.

This statement was made in a case where no tolling statute existed. In these circumstances the statement is quite understandable. It is entirely inapposite, however, to the present case where the tolling statute has always been a part of the three year statute of limitations. Sections 6 and 14 of Chapter 123 of the Code of 1852, entitled "Limitation of Personal Actions", Del.Rev. Stats. §§ 2742, 51 (1852). Today both sections are a part of 10 Del.C., Chapter 81 (1974) entitled "Personal Actions". 10 Del.C. §§ 8106, 17 (1974).

*Hurwitch v. Adams, supra*, and *Bokat v. Getty Oil Co., supra*, have even less relevance than the *Pawnee Bill* case. *Hurwitch* held that 10 Del.C. § 8116 (1953) (the equivalent of the present 10 Del.C. § 8117 (1974)) was ineffective to toll the period of limitations when the non-resident motorist could have been served within the statutory period under the Non-Resident Motorist Act. As indicated, this service is "the equivalent of personal service". In *Bokat, supra*, the Court held that although the action had been begun before the statute of limitations had run, it was nevertheless barred because plaintiff had waited until the statute had expired before sequestering the property of the defendant. The opinion did not even mention the tolling statute since, the action having been commenced before the statutory period had expired, the tolling statute was irrelevant.

*Shreve's Adm'r. v. Wells & Sappington*, 7 Del. (2 Houst.) 209 (Super.Ct. 1860), *rev'd*, 7 Del. (2 Houst.) 329 (1861), is the case which most clearly

---

14. The tolling statute based upon the absence of a defendant was part of the law in 1852, section 14 of Chapter 123 of the Revised Code of 1852, Del.Rev.Stats. § 2751 (1852). The one year limitation period was first enacted in 1897, 20 Del.Laws, c. 594, § 1 (1897) and made no reference to the tolling statute. Because of this the Court said:

"Where the Legislature has made no exception to the positive terms of a statute, the presumption is that it intended · to make none, and it is not the province of the court to do so." 66 A., at 474.

indicates the decision which a Delaware court would come to if it were faced with the question whether an action begun by sequestration was subject to the tolling provisions of section 8117 if the three year statute of limitations was relied upon as a defense. It, unlike *Pawnee Bill,* was concerned with a statute of limitations which *was* subject to the tolling provisions based upon the absence of the defendant.[15] In it plaintiff had brought suit on promissory notes by issuing a writ of foreign attachment against the absent defendants after the statutory period of limitations of six years had expired. The defendants pleaded the statute. By replication plaintiff sought to bring himself within the savings clause of section 14 of Chapter 123 of the Code of 1852, Del.Rev. Stats. § 2751 (1852), the equivalent of the present 10 Del.C. § 8117 (1974), to avoid the bar of the six year period of limitations. The demurrer of the defendant to the replication was based upon the alleged insufficiency of its pleading. The Superior Court, in a two to one decision, overruled the demurrer and rendered judgment for the plaintiff, 7 Del. (2 Houst.), at 222.

This decision was reversed by the Court of Errors and Appeals in a two to one decision, Chancellor Harrington and Judge Houston writing separate opinions for the majority, and Judge Wooten writing a dissenting opinion. While Chancellor Harrington and Judge Houston expressed themselves somewhat differently, they each agreed that the replication was inadequate to bring the plaintiff within the savings clause of the statute. They said it was not enough for plaintiff to have alleged that the defendants were absent from the state when the cause of action accrued and that from that time until the day the replication was filed they *"resided"* out of the state, but that an allegation of continued *absence* until six years before the commencement of the action was essential. The majority of the court inherently recognized that if the plaintiff had pleaded that defendants were absent from the state when the cause of action accrued and that they continued to be absent up to within six years of the commencement of the suit, the tolling statute would have saved the claim from the limitations defense notwithstanding that the action had been begun by foreign attachment. Chancellor Harrington said:

"The question then is, has the plaintiff replied this exception? Does the replication in any frame of words, say that the defendants were out of the State when the cause of action accrued and continued to be out of it either hitherto, or up to any time within six years of commencing the suit? That is what is denied by the demurrer, and that is the issue upon which the case turns. If the replication says this, the plaintiff avoids the bar of the statute and is entitled to judgment; if it does not allege such absence of the defendants from the State, or out of the jurisdiction of this court, the act bars his suit and he cannot recover." 7 Del. (2 Houst.), at 345.

Judge Houston said that the opinion of Chancellor Harrington was "clear and satisfactory", *id.* at 354. He addressed himself to the argument that the savings clause was without application to an action begun by foreign attachment and rejected it, saying:

"[t]here is therefore no good reason for holding that such a case as this, is not within the meaning and intention of the saving contained in the first paragraph of the fourteenth section of the statute." *Id.,* at 370.

Judge Wooten's dissenting opinion is consistent with the views of the majority that the tolling due to the non-residence of the defendants is applicable to

---

15. Both the six year limitations period and the tolling provision based on the absence of a defendant were part of Chapter 123, entitled "Limitations of Personal Actions"; See sections 8 and 14, Del.Rev.Stats. §§ 2744, 51 (1852).

an action begun by foreign attachment. Judge Wooten disagreed with the majority only in its conclusion that the replication was insufficient to give plaintiff the benefit of the tolling statute. He stated expressly that the law made no distinction in the application of the tolling statute between cases begun by summons and those commenced by foreign attachment, and that "[o]ne who could only be found by thus seizing his property, [was] not among those for whose benefit the statute of limitations was enacted . . . ." *Id.*, at 353.

The *Wells & Sappington* case was, of course, decided by both courts on a pleading issue. But its basic significance is substantive. It is crystal clear, however, that all of the five judges [16] who considered the question in the Superior Court and in the Court of Errors and Appeals were of the view that the statute of limitations would have been tolled during the absence of the defendants, provided that the plaintiff had properly pleaded the savings clause of the statute, and that this was true even though the action was begun by foreign attachment. While the *Wells* decision was rendered over 100 years ago its soundness has never been questioned.

A majority of the courts in other jurisdictions have held as did Wells, that a statute which provides for the tolling of a period of limitations during the absence of a defendant does not lose its vitality because a defendant has property within the jurisdiction which is subject to quasi in rem process during the limitation period. *500 Fifth Ave. v. Crone,* 171 F.Supp. 707 (W.D.Mo.1959) (applying New York law); *Waterman v. Sprague Mfg. Co.,* 55 Conn. 554, 12 A. 240 (1888); *Kimball v. Kimball,* 35 Ga. App. 462, 133 S.E. 295 (1926); *Grist v. Williams,* 111 N.C. 53, 15 S.E. 889 (1892); *Moss v. Standard Drug Co.,* 159 Ohio 464, 112 N.E.2d 542 (1953); *Electric Supply Co. v. Garland,* 188 Okl. 21,

105 P.2d 758 (1940). *See also* 51 Am. Jur.2d, Limitations of Actions, § 163 (1970) and 119 A.L.R. 337–42.

■ However, whether or not section 8106 is subject to an interpretation that the tolling period comes to an end when the defendant first has property in Delaware which plaintiff could seize, has not been argued nor is it now decided. Facts which may be pertinent to this question do not appear of record. Possibly of significance would be the time when defendant first owned property in Delaware, its nature, whether its presence was known to plaintiff or with due diligence should have been known to him, and if so when, and the relationship of the value of the property to the size of plaintiff's claim.

The motion of the defendant for summary judgment based upon the statute of limitations and/or laches is denied.

*Forum Non Conveniens*

■ Defendant asks that the doctrine of *forum non conveniens* be applied and the case dismissed stating that a Mexican court would be the proper forum for determining the factual and legal issues that have arisen in this case. The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is otherwise authorized by the letter of the law. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The application of the doctrine leaves much to the discretion of the court, *id.,* at 508, 67 S.Ct. 839. The limitation on its exercise is narrower than under the transfer statute, 28 U.S.C. § 1404(a), which was later enacted. *Norwood v. Kirkpatrick,* 349 U.S. 29, 75 S.Ct. 544, 99 L.Ed. 789 (1955). Although the *Gilbert* decision was rendered prior to the enactment of section 1404(a), federal courts still have inherent power to refuse jurisdiction under the forum non conveniens principle,

---

16. They included two judges (unidentified in the Superior Court report of the case) who held that the demurrer to the replication should be overruled, Houston dissenting, and the three judges, including Houston, who sat on the Court of Errors and Appeals.

*Prack v. Weissinger,* 276 F.2d 446, 448 (4th Cir. 1960) and *Vanity Fair Mills v. Eaton Co.,* 234 F.2d 633, 645 (2nd Cir. 1956), *cert. denied,* 352 U.S. 871, 77 S. Ct. 96, 1 L.Ed.2d 76 (1956) and the considerations mentioned in *Gilbert* have continued vitality, *Fitzgerald v. Westland Marine Corp.,* 369 F.2d 499, 501 n. 3 (2nd Cir. 1966).

The "important considerations" to be weighed in determining whether a case should be dismissed on the principle of forum non conveniens are stated in the *Gilbert* case to be:

"[t]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial." 330 U.S., at 508, 67 S.Ct. at 843.

While *Gilbert* held that the action should be dismissed there can be no doubt that the Court was considerably influenced by the fact that the plaintiff who resided in Virginia left Virginia to bring suit in New York "without even a suggested reason for transporting th[e] suit to New York", *id.,* at 510, 67 S.Ct. at 844. All relevant phases of the case took place in Virginia. The Court said that "the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy," *id.,* 330 U.S. at 508, 67 S.Ct. at 843. It continued:

"But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.*

In *Koster v. Lumbermen's Mutual Co.,* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947) the Court again emphasized the importance to be placed upon the plaintiff's choice of his home forum, saying:

"Where there are only two parties to a dispute, there is good reason why it should be tried in the plaintiff's home forum if that has been his choice." *Id.,* at 524, 67 S.Ct. at 831.

In *Thomson v. Palmieri,* 355 F.2d 64, 66 (2nd Cir. 1966) the Court said that a court should respect plaintiff's choice of forum so long as its selection has not been for the purpose of vexing or harassing the defendant.

Defendant disregards the reasonableness of plaintiff's determination to sue in Delaware. It focuses instead only on the inconvenience which it will sustain if the action is tried here. It points out that many questions of Mexican law will be involved in a trial on the merits, key witnesses are domiciled in Mexico, voluminous documentary evidence upon which plaintiff bases its claim is on file in Mexico under the control of an agency of the Mexican government, the documents are in Spanish, and this Court is without compulsory process power to compel the attendance of unwilling nonparty witnesses located in Mexico, and the costs and inconvenience of transporting willing witnesses from Mexico to Delaware will be severe.

The question of the expense that the defendant would be put to if suit were brought in Delaware requires scant consideration when the relative positions of the parties are weighed. Plaintiff is without sufficient funds to proceed in Mexico while the defendant is a multimillion dollar corporation. To require plaintiff to go to Mexico to proceed with the suit would probably leave him without a remedy. (D'Angelo Affidavit, March 10, 1975, Doc. 70, ¶ 10.)

Furthermore, the argument of the defendant that a trial in Delaware would entail excessive expense and inconvenience seems somewhat overwrought insofar as the resolution of the initial question is concerned, namely, whether the

expropriation decree, properly construed, encompassed the confirmatory concessions and interests which are the basis of plaintiff's claim. This would appear, at the moment at least, to be determinable primarily, if not exclusively, on the basis of expert testimony.[17] If this question should be resolved in the defendant's favor this would end the law suit. On the other hand, if plaintiff should prevail much of the evidence pertinent to the accounting could and would probably be developed in pretrial procedures conducted either in Mexico or Delaware with a measure of control, including the imposition of costs, in the hands of the Court.

 The fact that the success or failure of plaintiff's case depends upon the law of Mexico does not, of itself, justify a dismissal. There may be difficulties in attempting to determine and apply foreign law but the rules of the foreign law and their interpretation are simply questions of fact and involve difficulties no different from those which the federal courts sometimes experience in attempting to determine the law of other state jurisdictions. *Burt v. Isthmus Development Co.*, 218 F.2d 353, 357 (5th Cir. 1955), *cert. denied*, 349 U.S. 992, 75 S.Ct. 661, 99 L.Ed. 1254. The interpretation of the law of a foreign country is a task from which federal courts do not shrink. *Lesser v. Chevalier*, 138 F.Supp. 330 (S.D.N.Y.1956).

In *Vanity Fair Mills v. Eaton Co.*, *supra*, at 646, it was said that courts of the United States are reluctant to apply the doctrine of forum non conveniens when it would force an American citizen to seek redress in a foreign court. Indeed, in *States Marine Lines, Inc. v. The M/V Kokei Maru*, 180 F.Supp. 255 (N.

D.Cal.1959) the Court said that *Gilbert* which applied the forum non conveniens doctrine as between American domestic forums is not directly in point where the choice lies between an American forum and that afforded by a foreign nation. *Id.*, at 257.

In *Stewart v. Godoy-Sayan*, 153 F. Supp. 544 (S.D.N.Y.1957) plaintiff, in arguing against a dismissal under forum non conveniens, contended that the court was without power to deny citizens of the United States access to a federal court and compel them to litigate in a foreign country. The Court said that there seemed to be no case which definitely passed on this question where the citizen was suing in his own right, *id.*, at 546. It pointed out that in *United States Merchants' & Shippers' Ins. Co. v. A/S Den Norske Og Australi Line*, 65 F.2d 392 (2nd Cir. 1933) Judge Learned Hand had said by way of dictum that the citizen's right to access to the federal court when he sues in his own right is conclusive against remission to a foreign jurisdiction under the doctrine of forum non conveniens. In *Stewart* the Court said:

"There is every reason for following Judge Hand's dictum in the *Den Norske* case so my only question is whether or not plaintiffs sue 'in their own right' within his meaning."[18]

In the *States Marine Lines* case the Court also stated that other authorities (citing them) have pointed out that no court has ever applied the doctrine of forum non conveniens to decline jurisdiction to a United States citizen suing in his own right in the absence of some express agreement to seek his remedy in a foreign forum, and that other authorities (citing the *Den Norske* case) have

---

17. Upon application of either of the parties, or perhaps without such an application, the Court would consider adjudicating this issue in advance of the accounting. This step-by-step determination would be analogous to the procedure frequently followed in patent cases where patent validity and infringement are determined initially, followed by an accounting if necessary.

18. 153 F.Supp., at 547. Since plaintiffs were stockholders of a Cuban corporation and were claiming that wrongs were done to it by another Cuban corporation, as a result of a Cuban transaction, the Court held that they were not suing in their own right but in effect derivatively. *Id.*

implied that the doctrine may not be thus applied, 180 F.Supp., at 257.

In *The Saudades*, 67 F.Supp. 820 (E. D.Pa.1946) plaintiffs, American citizens, brought a libel in personam against two Portuguese companies by obtaining jurisdiction by foreign attachment of credits in the district. Judge Kirkpatrick refused to dismiss the action upon the ground of forum non conveniens. After stating that no decision had been called to his attention and that he had found none in which the right to maintain in an American court a suit of which the court had jurisdiction had been refused to an American litigant suing in his own right, and after noting Judge Hand's dictum in the *Den Norske* case, Judge Kirkpatrick said:

> "Perhaps the best way to put the rule, so far as it can be gathered from more or less indirect references to it in the decisions, is, that an American court may not refuse to try a case brought by an American citizen, unless it feels that injustice would be done by allowing him to proceed in his own court. The result of such a rule is that the discretion of the court, so far as it has any existence, is limited, and that mere inconvenience to the respondent, or to both parties, will not be considered a ground for exercising it to refuse jurisdiction. In the present case, while it is obvious that considerations of convenience make for the trial of the issue by the courts of Portugal, it does not appear that the case can not be tried here without entire justice to both parties." *Id.*, at 821.

In *Mobile Tankers, Co. v. Mene Grande Oil Co.*, 363 F.2d 611 (3rd Cir. 1966) *cert. denied*, 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225, the Court said:

> "A citizen of the United States may have no absolute right to have his case tried in a federal court but his election of such a forum should not be disregarded in the absence of persuasive evidence that the retention of jurisdiction will result in manifest injustice to the respondent. (citations omitted). This is so even though the more convenient forum may be the foreign one. *The Saudades, supra.*" *Id.*, at 614.

By its reference to *The Saudades* the Court of Appeals affirmed the *Saudades* principle that "mere inconvenience to the respondent, or to both parties, will not be considered a ground for exercising it ['s discretion] to refuse [its] jurisdiction" and said there can be no justification for a dismissal in the absence of "persuasive evidence that the retention of jurisdiction will result in manifest injustice", *id.*, at 614.

■ There is no evidence in the record in the instant case which could possibly support the conclusion that a trial in Delaware would result in manifest injustice. By contrast, even if the existence of the power to dismiss is assumed, the effect of a dismissal would be clearly unjust to the plaintiff.

The motion of the defendant for summary judgment based upon forum non conveniens is denied.

### Plaintiff's Motion

■ This requires only brief discussion. As the record now stands, the evidence as to whether plaintiff's rights were divested by the decree is in conflict.

Gaither, although an interested party, was well qualified to speak on the point. Time and again during his deposition he expressed the opinion that the decree left unaffected Papantla's rights under which plaintiff claims. The existence or at least the possible existence of such rights is established or it can be inferred from other portions of the record. These need not be detailed, for the record contains substantial evidence which would support the view that the expropriation decree completely divested Papantla of all of its rights. (E. g., Sarachaga Affidavit, March 6, 1974, Doc. 23; Carrillo-Macor and Ramirez Affidavit, January 31, 1975, Doc. 66; and Carrillo-Macor Affidavit, March 17, 1975, Doc.

69.) It should be noted that all of these affiants, like Gaither, are interested, Sarachaga describing himself as a "representative in New York of the defendant" and Carrillo-Macor and Ramirez describing themselves as "attorneys employed in Mexico City" by the defendant. The affidavit of Sarachaga fails to disclose any qualification which he has to speak on the effect which the expropriation decree had on plaintiff's rights.

It is not the Court's function, however, to weigh the credibility of the various witnesses or to weigh their testimony. At this juncture the evidence adduced by the defendant must be believed.

Plaintiff's motion for summary judgment will be denied.