James P. D'ANGELO, Receiver for Papant-
la Royalties Corporation, a dissolved
Delaware Corporation, Plaintiff,

v.

PETROLEOS MEXICANOS, a decentral-
ized Institution pertaining to the
Republic of Mexico, Defendant.

Civ. A. No. 74–17.

United States District Court,
D. Delaware.

Oct. 7, 1976.

On Motion for Reargument Nov. 4, 1976.

William H. Bennethum, III, Wilmington, Del., for plaintiff.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., for defendant; Manuel R. Angulo and Jose T. Moscoso, of Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel.

STEEL, Senior District Judge:

The case is before the Court upon a motion of defendant for summary judgment which raises two "act of state" questions: (1) whether the decree of the President of Mexico dated March 18, 1938, which expropriated oil in Mexico owned by foreign nationals, an admitted act of state, had the effect of extinguishing the royalty and participating interests which Papantla Royalties Corporation ("Papantla") claims to have had in the expropriated oil; and (2) whether the actions taken by the Mexican commissions created by presidential decrees of 1945 and 1947 for the purpose of indemnifying persons whose royalty and participating interests in Mexican oil were extinguished, and in particular the refusal of the commissions to recognize certain claims of Papantla, were acts of state of the Mexican government.

Plaintiff is James P. D'Angelo, the receiver of Papantla Royalties Corporation, a dissolved Delaware corporation, appointed by the Delaware Court of Chancery and as such entitled to assert Papantla's claims. The defendant, Petroleos Mexicanos ("Pemex") is a decentralized agency of the Mexican government, which is engaged in all phases of the oil business. Plaintiff seeks an accounting upon the theory that Papantla's royalty and participating interests were not extinguished by the decree of expropriation, but continue to exist with respect to oil produced by Pemex since the expropriation. He also seeks a judgment based upon the failure of Pemex to indemnify Papantla for the destruction of its royalty and participating interests should the Court find that the effect of the expropriation decree was to extinguish them.[1]

The background of this litigation can be found in *D'Angelo v. Petroleos Mexicanos,*

---

1. The complaint prays for an accounting. The evidence and arguments, however, also embrace a claim for indemnification. Both aspects of plaintiff's claim will be considered.

398 F.Supp. 72 (D.Del.1975) in which an earlier motion of the defendant for summary judgment was denied. There the Court refrained from deciding whether the expropriation decree had any effect upon Papantla's interests. It noted that the record failed to disclose any "official interpretation" by the Mexican government of the scope of the decree, as had the record in *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942) where the question was the scope of a decree of the Soviet government.

■ Before considering the two substantive act of state questions, a preliminary matter must be disposed of. Plaintiff argues that the present motion should be denied, stating that it is simply a reargument of the act of state doctrine which was the subject of the earlier motion and hence the denial of that motion constitutes the law of the case. Although the record has been expanded significantly since the first motion was decided, plaintiff points out that all of the "new evidence" and the decision in *United States v. Pink, supra,* upon which defendant now rests its argument were available when it filed its prior motion. This is true. Despite plaintiff's assertion to the contrary, the present motion does not rest upon the same evidence or legal theory as did the first.

The question whether the meaning and effect of the expropriation decree should be resolved by trial as the plaintiff contends or simply by a motion for summary judgment was determined in favor of the latter procedure after the parties had been heard. As a result of a pretrial conference which took place on April 1, 1976 (Doc. 113); the Court entered an order on April 9, which required defendant to serve and file by April 15, 1976, its "proposed" motion for summary judgment and its "proposed" brief and supporting papers (Doc. 112). Defendant complied with this order. With defendant's "new" evidence and legal theories thus before him, plaintiff was apprised of the defendant's evidentiary and legal position. On May 5, the Court called a further conference for May 25 and wrote plaintiff's attorney as follows:

"I am notifying you that at the May 25, conference the pending motion of the defendant for summary judgment will be set down for hearing and a schedule fixed for the filing of briefs and supporting and opposing documents unless you satisfy me at the conference that a prima facie basis exists upon which it can be plausibly asserted that the motion for summary judgment should not be fixed for hearing because genuine issues of material fact ostensibly exist." [2]

At the hearing on May 25, 1976, the Court requested plaintiff to specify the fact issues which he contended would be raised by defendant's motion if it were filed. Plaintiff designated the issues as: (1) whether the Mexican attorney general had the power to give an opinion concerning the scope and effect of the expropriation decree,[3] (2) if he did, whether he exercised the power properly, and (3) whether the record disclosed the existence of an act of state by the Mexican government. (Doc. 118, pp. 6–8). Since it appeared that these would be the only so-called fact issues which the motion might possibly involve, that a trial would require the presence of witnesses from Mexico and a consideration of records and documents located in Mexico, and that substantial testimony in Spanish would be presented at a trial, the Court determined

---

**2.** While the record does not reveal it, a copy of the letter of May 5, 1976 in the Court's file stated immediately after the portion above quoted:

"I shall, of course, reserve any definitive determination of the motion, including whether genuine issues of fact exist, until after the motion has been briefed and argued, if indeed I should at the conference of May 25, fix a hearing date on the motion."

**3.** The transcript of the May 25, 1976 conference indicates that plaintiff proposed to produce an attorney from Mexico as an expert "who will deny that the Attorney General even has the power to write the letter that he did." (Doc. 118, p. 6). The reference to "the letter" was obviously erroneous but referred to the affidavit of the attorney general. (Exhibit 3 attached to Doc. 115A). This affidavit is the document which the plaintiff had before him at the May 25 conference.

to permit the summary judgment motion to be filed, having in mind that if it were granted a protracted trial would be avoided. It appeared to the Court that a preliminary test of the merit of the act of state defense by motion would be in the interest of an equitable and practical handling of the case and a reasonable exercise of discretion. Considering the foregoing factors and that the record has now been expanded beyond that which was before the Court when the prior motion was heard, the law of the case doctrine is no bar to consideration of the pending motion.

### The Effect of the Expropriation Decree Upon Papantla's Royalty and Participating Interests

█ This is the question left open by the Court's earlier opinion in *D'Angelo v. Petroleos Mexicanos, supra,* p. 78.

In support of its present motion Pemex argues that the effect of the expropriation decree of 1938 [4] was to extinguish Papantla's royalty and participating interests. On the other hand, plaintiff contends that the expropriation decree, which he concedes to be a valid act of state [5] as this Court held in *D'Angelo v. Petroleos Mexicanos, supra,* at p. 78, is so limited in its terms as not to include Papantla's interests. Plaintiff

points out that the decree is expressly limited to seizing the personal and real properties belonging to 17 specified oil companies and nothing more. Plaintiff denies that Papantla owned any of these properties and claims that it only owned royalty and participating interests attributable to the confirmatory concessions, neither of which the decree purported to reach.

In view of plaintiff's position Pemex requested the attorney general of Mexico to render an official interpretation of the scope and effect of the expropriation decree. Acting under authority of Mexican law the attorney general did so. His opinion states in pertinent part (Doc. 115A, Exhibit 3, pp. 2–3):

"[A]ll of the rights of royalty holders [regalistas], that is to say, of surface owners who were entitled, in accordance with contracts with such oil companies, to receive indemnification payments for the occupation of lands; . . . were terminated and extinguished as a result and as a direct consequence of the said Expropriation Decree, by virtue of which all of the properties, movables and immovables, of the 17 petroleum companies mentioned therein were expropriated. Such rights were terminated and extinguished by reason of the legally relevant fact that,

---

4. The expropriation decree of March 18, 1938, reads as follows (Doc. 57, Exhibit E):

"Decree which expropriates in favor of the Patrimony of the Nation, personal and real properties belonging to the oil companies who refused to accept the decision of the 18th of December of 1937 of group number 7 of the Federal Board of Conciliation and Arbitration.

"There is expropriated by reason of public utility in favor of the Nation; the machinery, installations, buildings,—pipelines, refineries, storage tanks, ways of communication, tank cars, distribution stations, embarcations and all of the other personal property and real property of: Compania Mexicana de Petroleo El Aquila, S.A., Compania Naviera De San Cristobal, Compania Naviera San Ricardo, S.A.; Suasteca Petroleum Company; Mexican Sinclair Petroleum Corporation; Stanford y Company Sucesores, S. en C.; Penn Mex Fuel Company, Sinclair Oil, Pierce Oil Company; Richmond Petroleum Company de Mexico; Compania Petrolera el Agwi, S.A.; Compania de Gas y Combustible Imperio;

Consolidated Oil Company of Mexico; Compania Mexicana de Vapores San Antonio, S.A.; Sabalo Transportation Company; Clarita, S.a. y Cacalilao, S.A., in amounts as may be necessary in the opinion of the Secretariat of National Economy for the discovery, production, transportation, storage, refinery and distribution of the petroleum industry."

5. The traditional formulation of the act of state doctrine is that in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

See also *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1963).

as a result of the 1938 Expropriation Decree, the said companies from that date were deprived of the right to exploit or utilize the concessions in any form, and consequently, it was legally impossible for the said companies to perform their obligations with respect to lessors, royalty holders, or third parties, in general, and the assignees thereof."

In *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942) the issue was whether expropriation decrees of the Soviet government were intended to have extra-territorial effect with respect to property in New York. That same issue had previously been determined in a companion case, *Moscow Fire Ins. Co. v. Bank of New York & Trust Co.,* 280 N.Y. 286, 20 N.E.2d 758 (1939), *aff'd* 309 U.S. 624, 60 S.Ct. 725, 84 L.Ed. 986 (1940) by a referee appointed by the lower court to determine, among other things, the intended effect of the Soviet decrees. Based on the record then before him, which did not include an opinion of the Commissariat of Justice of the Soviet government, the referee found that the Soviet decrees were not intended to have extra-territorial effect. Subsequent to the hearings in the *Moscow* case, the plaintiff, being the United States Government in both the *Moscow* and *Pink* cases, requested the Commissariat of Foreign Affairs of the Soviet government to obtain an official declaration by the Commissariat of Justice in order to make clear, as a matter of Russian law, the effect of the particular expropriation decree. *Pink, supra,* at 218, 62 S.Ct.

552. In response to that request the Commissariat of Justice issued an interpretation on November 28, 1937, which declared that the expropriation decree which had been promulgated in 1918, nearly 20 years earlier, had extra-territorial effect. The Supreme Court, finding this to be an official interpretation of the decree, held that it foreclosed further inquiry by United States courts on the subject. 315 U.S. at 220–21, 62 S.Ct. 552.[6]

The principle of *Pink* requires this Court to accept the opinion of the attorney general of Mexico as an official declaration by that government that the effect of the expropriation decree was to extinguish Papantla's royalty and participating rights in the expropriated oil.

Plaintiff contends, however, that the attorney general's opinion is irrelevant for the reason that he is not the proper authority to render a conclusive opinion on the meaning and effect of the expropriation decree. This is the prerogative, plaintiff asserts, of the Mexican judiciary which is the only arbiter of property rights in Mexico. Plaintiff bases this statement upon the opinion of the Mexican attorney Sr. Ortega.[7]

No inconsistency exists between the opinion of the attorney general and that of Sr. Ortega. The two opinions are satisfactorily reconciled by the Mexican attorney Sr. Carrillo in his affidavit of August 19, 1976 (Doc. 126, Exhibit 3).[8] Sr. Carrillo agrees with the opinion of Sr. Ortega that in Mexi-

---

**6.** The Court in *Pink* quoted the interpretation of the Commissariat of Justice as follows:

"The People's Commissariat for Justice of the R.S.F.S.R. certifies that by virtue of the laws of the organs of the Soviet Government all nationalized funds and property of former private enterprises and companies, in particular by virtue of the decree of November 28, 1918 (Collection of Laws of the R.S.F.S.R., 1918, No. 86, Article 904), the funds and property of former insurance companies, constitute the property of the State, irrespective of the nature of the property and irrespective of whether it was situated within the territorial limits of the R.S.F.S.R. or abroad." 315 U.S. at 219–20, 62 S.Ct. at 560.

**7.** Affidavit of Sr. Ortega dated June 23, 1976, attached as Exhibit A to plaintiff's answering brief to defendant's main brief, etc., Doc. 122.

**8.** Sr. Carrillo has distinguished credentials. He has been licensed to practice in Mexico for 45 years during which time he has held numerous positions which mark him as a man of credibility in the area in which his opinion is expressed. He has been Professor of Administrative Law as well as the Dean of the Faculty of Law in the National Faculty of Jurisprudence, Director General of a governmental financial institution, Secretary (Minister) of Finance and Public Credit of the Mexican Government, Ambassador to the United States, Secretary (Minister) of Foreign Affairs of Mexico, the author of various books on Mexican law, and the recipi-

co the arbiter of property rights lies exclusively with the Mexican judiciary. He points out, however, that under Mexican law the judiciary has no power to issue advisory or consultative opinions but can only render decisions when controversies have been submitted to it for resolution. He states that under Mexican law the attorney general is the "juridical counselor of the government",[9] and that in the absence of an adjudication by a Mexican court of a dispute or controversy, he is not only the proper authority, but the highest and sole authority empowered to issue official legal opinions in response to a proper request. Sr. Carrillo concludes by stating that the Mexican attorney general acted properly and within the scope of his constitutional and legal authority when he rendered his opinion to Pemex stating that the effect of the expropriation decree was to extinguish Papantla's royalty and participating interests in the expropriated oil.

The opinion of the attorney general stands uncontroverted. His opinion on the effect of the expropriation decree on the rights asserted by plaintiff must be accepted by this Court as an "official declaration" by the Mexican government. As such it precludes this Court from reexamining the question just as the opinion of the Commissariat of Justice did in the *Pink* case. The expropriation decree, so interpreted by the attorney general of Mexico, was an act of state by the Mexican government, and requires this Court to abstain from further

inquiry into its scope and effect. In this view of the matter it is not necessary to determine whether the opinion of the attorney general was itself an act of state.

Plaintiff argues that the recent case of *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), "abolished" the act of state doctrine and "dealt a death blow" to it. The case warrants no such interpretation. The *Dunhill* case arose out of the confiscation by the Cuban government of the business and assets of five Cuban cigar manufacturers.[10] The Cuban government appointed "interventors" to replace the old ownership and to take possession and operate the businesses. Dunhill was an American importer of Cuban cigars. After intervention Dunhill and two other American importers made payment to the interventors for cigars purchased prior to intervention under the assumption that the interventors were entitled to collect the accounts receivable of the confiscated businesses. The former owners of the confiscated businesses then sued the importers. They claimed that the payments which the importers had made to the interventors were erroneous and that payment was still due them from the importers. The district court sustained the claims of the former owners. As a result of this decision the importers asserted a claim against the interventors and the Cuban government for recovery of their mistaken payments of preintervention accounts.

ent of Honorary Doctor of Law degrees from Harvard University, Southern Methodist University and Lincoln College. He is presently a member of the National College, a public institution of higher education composed of 32 Mexican scholars appointed for life, as well as a lecturer on constitutional and administrative law in the National College and in several universities throughout Mexico.

9. Article 2, paragraph V, of the Ley de La Procuraduria provides in relevant part:
 "The Attorney General of the Republic shall have the following powers . . .
 V. To issue his opinion as juridical counselor of the Government, when he is so ordered or requested." (Urquia affidavit, Exhibit C, Doc. 115A, Exhibit 6).

10. This fairly complex litigation involved numerous other issues in addition to the act of state question. The facts set forth in the text are pertinent to an understanding of the defense of act of state relied upon by the Cuban government. A complete statement of all the facts regarding the various claims arising from the Cuban government's confiscation of the cigar industry is unnecessary. A history of the litigation may be found in *Mendez v. Gaber, Coe & Gregg,* 345 F.Supp. 527 (S.D.N.Y.1972), *Mendez v. Saks and Company,* 485 F.2d 1355 (2d Cir. 1973) and *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); see also *Palicio v. Brush,* 256 F.Supp. 481 (S.D.N.Y.1966), *aff'd* 375 F.2d 1011 (2d Cir. 1967), *cert. denied,* 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967).

The interventors defended upon the ground that their refusal to repay the importers was an act of state not subject to question in the United States courts. On appeal by Dunhill to the Supreme Court this contention was rejected. The Court held, in a five to four decision, that the Cuban government had failed to sustain its burden of proving an act of state. The Court affirmed the finding of the district court that "the only evidence of an act of state other than the act of nonpayment by interventors was a 'statement by counsel for the interventors, during the trial, that the Cuban government and the interventors denied liability and had refused to make repayment.'" The Court held that this statement of counsel "merely restated respondent's original legal position and adds little, if anything, to the proof of an act of state."

In the *Dunhill* case there was no "official declaration" by the Cuban government that the refusal of the interventors to pay Dunhill's claim was authorized by their appointment or by the confiscation decree. The Court considered this important for it said:

"No statute, decree, order or resolution of the Cuban government itself was offered in evidence indicating that Cuba had repudiated her obligation . . . ."

The absence of any evidence that the repudiation of Dunhill's claim was deemed to be an official act of the Cuban government, without more, distinguishes *Dunhill* from the instant case. Here Pemex placed in the record the official declaration of the Mexican government expressed through its attorney general that the effect of the expropriation decree was to extinguish Papantla's rights.

Plaintiff places great store upon that part of the *Dunhill* opinion which, speaking through Mr. Justice White, states that an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign government or by one of its commercial instrumentalities.[11] Plaintiff argues that since Pemex was engaged in a commercial business the act of state doctrine has no relevance to it.

■ It is true that Pemex is engaged in a commercial business, the operation in Mexico of an oil company for profit. The expropriation, however, was not accomplished as an incident to this business. Pemex was not even in existence when the expropriation occurred. The fact that the Mexican government ultimately entered the oil business through Pemex does not make the expropriation itself commercial activity. It is a classic example of the exercise of a governmental power as an act of the sovereign. For this reason the opinion of Mr. Justice White and the three justices joining him in *Dunhill,* relating as the opinion does to governmental action in a commercial area, can have no relevance to the present case.

■ Finally, plaintiff contends that the Payne-Warren Agreement which was entered into at the so-called Bucareli Conferences supercedes and nullifies the effect which the expropriation decree might otherwise have had upon plaintiff's royalty and participating rights. This argument requires a review of the events which preceded the Bucareli Conferences and a discussion of its culminating events.

Prior to the adoption in 1917 of the Mexican Constitution, Article 27, the owners of the surface of land owned the oil in the subsoil. Article 27 changed this by providing that the oil in the subsoil belonged to the Mexican government which was authorized to grant concessions for oil exploitation under conditions not presently important. The effect of the 1917 Constitution

---

11. Mr. Justice Stevens failed to join in this part of the opinion of the other four justices (Part III) although he was one of the five justices who found that no act of state had been proven by the Cuban government.

Four of the justices, in a minority opinion written by Mr. Justice Marshall, expressed doubt as to the wisdom of applying with inflexibility a "commercial transaction" exception to the act of state doctrine but rather favored a case to case approach.

was to cancel all concessions granted to foreigners prior to the adoption of the 1917 Constitution. A number of foreign governments, including the United States, protested. As a result the so-called Bucareli Conferences were called and held in Mexico City in 1923. The United States was represented at the conferences by Messrs. Payne and Warren, who had been commissioned by the President.

Plaintiff asserts that at the conclusion of the conferences Messrs. Payne and Warren signed an "Executive Agreement" on behalf of the President—plaintiff refers to it as the "Payne-Warren Agreement"—and that this constituted a "bilateral agreement" or "international agreement" between the United States and Mexico under which the Mexican government recognized the pre-constitutional rights of the landowners and of foreign nationals derived through them. This so-called agreement, plaintiff asserts, changed the law declared by the 1917 Constitution so that landowners could acquire confirmatory concessions from the Mexican government entitling them to utilize oil under their land if they could prove to the satisfaction of the government that prior to May 1, 1917, they had intended to do so.

Plaintiff further contends that principles established by the Supreme Court of the United States require that the "Payne-Warren Agreement" be treated as the legal equivalent of a treaty and that the rights acquired by the United States or its nationals under a treaty must be honored regardless of any act of state of the other party to it.

It is not necessary to examine the validity of these legal principles. It is sufficient to point out that the Bucareli Conferences did not result in an agreement of any kind between Mexico and the United States.[12] At the conferences[13] the Mexican commissioners stated as Point I that it would be "the future policy" of the Mexican government to continue to enforce the principles of the decisions of the Supreme Court of Justice of Mexico in five "amparo" cases. In these decisions the Court had declared that Article 27 of the Constitution of 1917 was not retroactive and had no effect upon owners of the surface or those entitled to exercise their rights to explore for oil or take some related action, if, prior to 1917, they had performed "some positive" act which had manifested an intention to exercise such rights.[14] The commissioners stated further that the Mexican government would grant permits to such persons to drill upon their lands under certain limitations not presently relevant. In Point III the Mexican commissioners referred to the rights of this limited group of persons as "preferential rights". In this litigation the

---

**12.** In this Court's prior decision in *D'Angelo v. Petroleos Mexicanos, supra,* the Court stated that as a result of the Bucareli Conferences "agreements were entered into between the Mexican government and certain of the foreign nations, including the United States, represented by Messrs. Payne and Warren." (398 F.Supp. at 74). In making this statement the Court relied upon references in Gaither's testimony to the "Bucareli Agreement", "Warren-Payne Agreement", and the "Bucareli Treaties". See Doc. 56, pp. 20, 78, 112 and Exhibit B attached to plaintiff's earlier reply brief (Doc. 68). This statement of the Court was erroneous as will appear from the text of this opinion. This error, however, does not affect the *D'Angelo v. Petroleos Mexicanos* holding.

**13.** Minutes of the conference were taken in English and a transcript thereof appears at p. 82 of the article "The Bucareli Agreements and International Law": by Antonio Gomez Roble-

do, Professor of International Law, National University of Mexico, published in 1940. Exhibit 1 attached to the reply brief of defendant. (Doc. 126).

**14.** These "positive acts" were described as:

"drilling, leasing, entering into any contract relative to the subsoil, making investments of capital in lands for the purpose of obtaining the oil in the subsoil, carrying out works of exploitation and exploration of the subsoil and in cases where from the contract relative to the subsoil it appears that grantors fixed and received a price higher than would have been paid for the surface of the land because it was purchased for the purpose of looking for oil and exploiting same if found; and, in general, performing or doing any other positive act, or manifesting an intention of a character similar to those heretofore described." *Robledo* article, *supra,* p. 83.

rights have been referred to as "confirmatory concessions."

As to the policy of the Mexican government to grant the "preferential rights" in the future the Mexican commissioners stated in Point IV that:

"the policy of the present Executive is not intended to constitute an obligation for an unlimited time on the part of the Mexican Government . . ."

In Point V the United States commissioners stated that the United States reserved the rights of its citizens under international law and equity to the subsoil of the lands owned by them prior to the promulgation of the Constitution of 1917. The Mexican commissioners stated that they recognized the rights of the United States to make the reservation.

Commenting upon the "juridical value" to be attributed to the statements by the Mexican commissioners, Professor Robledo in the article entitled "The Bucareli Agreements and International Law" [15] said at p. 87:

". . . [t]hey do not commit the Mexican state to the same extent the treaties do, that is, with a strict bond of law."

Continuing, he said at p. 89:

"[T]he statements under discussion do not constitute a treaty—inasmuch as the commissioners had no plenipotentiary power to reduce them to that solemn form, and as the statements themselves received no ratification from the Senate or the approval of the President and their subsequent promulgation,—they are not and have never been a law for the state. They merely enunciate the conduct that the government in behalf of which they were made meant to follow; hence they can be amended or repudiated by later governments."

The United States Department of State likewise reviewed the transcript of the minutes of the Bucareli Conferences which Professor Robledo had discussed, and it concluded (Doc. 126, Exhibit 2):

"Thus, the said document is not a treaty or Executive agreement of the United States."

See also letter dated September 13, 1976, from the State Department to plaintiff's attorney attached to affidavit of Andrew Ross (Doc. 127).

Plaintiff's contention that an agreement or treaty between the United States and Mexico was entered into at the Bucareli Conferences is negated by all the material evidence in the record. What the Mexican commissioners said at the conferences amounted to nothing more than a declaration of policy of the existing government which was subject to amendment or revocation by the government at any time in the future.

Under the uncontradicted material evidence plaintiff's claim must fail insofar as plaintiff seeks an accounting from Pemex for oil produced by it, based as the claim is on the theory that Papantla's royalty and participating rights which pre-dated the expropriation decree were not extinguished as a result of it. Evidence of record and plaintiff's argument, however, presents plaintiff's claim upon an alternative theory, i. e., that if Papantla's royalty and participating rights were extinguished by the decree, Pemex was obligated by Mexican law to compensate Papantla for their value which it has failed to do. It is this aspect of plaintiff's claim that is next considered.

*Whether the Failure of the Mexican Commissions to Indemnify Papantla for Its Royalty and Participating Interests Extinguished as a Result of the 1938 Presidential Decree was an Act of State*

■ The Mexican government recognized that the expropriation decree would cause loss to some lessors and holders of royalty and participating interests such as Papantla by its effect in extinguishing their rights. It therefore sought an equitable method by which those persons who were damaged could be compensated.

15. Exhibit 1 attached to reply brief of defendant (Doc. 126).

In 1945 the President of Mexico, as an exercise of his constitutional powers, issued a presidential decree delegating to Pemex primary responsibility for verifying the claims for rent and royalties and determining who were entitled to be compensated because of their loss. Thereafter Pemex assigned its duties under the decree to the Comision de Rentas e Regalias ("Comision de Regalias") which Pemex created for that purpose. The Comision de Regalias was staffed by lawyers who had been carrying out studies requested by the Director General of Pemex since 1944 concerning the problem of rent and royalty claimants. By the same 1945 decree the President established a governmental commission, Comision Depuradora e Liquidora de Rentas e Regalias del Petroleo ("Comision Depuradora"), composed of one official from the Ministry of Finance and Public Credit, one official from the Ministry of National Economy and two officials from Pemex. It had the responsibility for resolving and finalizing claims which it found to be meritorious after it had received satisfactory information as to the verification of the claims.

In 1947 a further presidential decree declared that:

"For obvious reasons of justice and for the convenience of the national economy, it is necessary to proceed to resolve the claims which are pending resulting from obligations directly linked to the indemnification for expropriation derived from the application of the Decree of March 18, 1938, with claimants of rents and royalties agreed upon by the expropriated companies. . . ."

The 1947 decree changed the name of Comision de Regalias to Comision Revisora de Rentas y Regalias ("Comision Revisora"), terminated the Comision Depuradora, and transferred the functions of the latter to Pemex which was to proceed as soon as possible with the verification and finalization of the rent and royalty claims such as those asserted by Papantla. Pursuant to the 1947 decree Pemex established in February 1948, the Comision de Regalias, Rentas e Indemnizaciones Globales ("Comision Global"). The duties and responsibilities for the execution of the national policies manifested in the presidential decrees of 1945 and 1947 were consolidated in the Comision Global. The authority of the commissions to provide indemnification for legitimate claims was recognized by Roscoe B. Gaither [16] on behalf of Papantla, who submitted its claims to the commissions for determination and accepted payment for those claims which the commissions deemed meritorious.

Pemex contends that the commissions were acting under presidential decrees and hence their activities, and in particular their failure to recognize and pay most of plaintiff's claims, were acts of state of the Mexican government, which, under relevant principles, require this Court to abstain from looking into the validity of the claims or reviewing the proceedings before the commissions.

That the actions of the commissions were acts of state is substantiated by the opinion of the attorney general of Mexico. In his affidavit of March 22, 1976, he said (pp. 6–8 of Exhibit 3, Doc. 115A):

"The Decrees of the President of the United Mexican States, in the legitimate exercise of his constitutional powers, in creating the *Comision Depuradora y Liquidadora de Rentas y Regalias del Petroleo* and the [creation of the] *Comision de Regalias, Rentas e Indemnizaciones Globales* by Petroleos Mexicanos, for the purpose of complying with the duties and obligations imposed thereon by the aforementioned Presidential Decrees, and its [Petroleos Mexicanos] activity as an instrumentality or agent of the Government for such purpose; and the determination of the legitimacy, evaluation, and the consequent acceptance or rejection of the aforementioned claims by the said Commisions [sic], were all, severally or

---

**16.** Gaither was the "father" of Papantla and until his death in 1974 represented it in all important matters.

collectively, acts of the Mexican Government performed by it and through its authorized agents, in the exercise of its governmental and sovereign powers;

. . ..

The procedure for indemnification established by the oft-cited Presidential Decrees of 1945 and 1947 neither contemplates nor recognizes, in any manner whatsoever, an award for damages by a foreign Court or Tribunal; since the procedure established by the said Decrees provides the sole and exclusive means to obtain the recognition of a right to damages suffered by lessors, royalty holders, third parties, and the assignees thereof, as a result of the oil Expropriation Decree in 1938."

As previously pointed out, the Mexican attorney general is the highest and sole authority empowered to issue official legal opinions when properly requested to do so. His opinion that the actions of the commissions were sovereign governmental actions is an "official declaration" of the Mexican government and under *Pink* must be conclusively accepted by this Court. That opinion compels the conclusion that the actions of the commissions were acts of state.

Plaintiff asserts that this conclusion is inconsistent with the holding in *Dunhill.* He points out that in *Dunhill* the Court rejected the Cuban government's argument that the refusal of the "interventors" to pay Dunhill was an act of state, and that the Supreme Court noted that no formal evidence was before it of the repudiation by the Cuban government of her obligations.

This, according to plaintiff, becomes significant in the light of the statement of Mrs. Gaither, the wife and executor of the estate of Gaither. She said that she examined her husband's personal files, the files of Papantla in her possession and the files of Pemex and that none contain any *written rejection* of Papantla's claims. From this plaintiff argues that in the absence of any formal rejection of Papantla's claims by the Mexican commissions their action, under *Dunhill,* cannot be viewed as an act of state.

Plaintiff misreads *Dunhill.* Four of the justices who joined in the dissenting opinion, writing through Mr. Justice Marshall, said:

"I do not understand the Court to suggest, however, that the act of state doctrine can be triggered only by a 'statute, decree, order or resolution' of a foreign government, or that the presence of an act of state can only be demonstrated by some affirmative action by the foreign sovereign. While it is true that an act of state generally takes the form of an executive or legislative step formalized in a decree or measure, see, *e. g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 403–405, n. 7, 84 S.Ct. 923, 927–928, 11 L.Ed.2d 804, 809–810 (1964); *Eastern States Petroleum Co. v. Asiatic Petroleum Corp.,* 28 F.Supp. 279 (S.D.N.Y.1939), that is only because duly constituted governments generally act through formal means. When they do not, their acts are no less the acts of a State, and the doctrine being a practical one, is no less applicable."

■■■ Non-action as well as affirmative conduct of a governmental agency, if based upon sovereign governmental authority, can have the status of an act of state. *French v. Banco Nacional,* 23 N.Y.2d 46, 295 N.Y. S.2d 433, 242 N.E.2d 704 (1968). Conduct otherwise having the quality of an act of state does not lose its character as such simply because it is not evidenced by a formal governmental decree. *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed.2d 456 (1897). The minority opinion in *Dunhill* recognizes this:

"That a foreign sovereign has issued no formal decree and performed no 'affirmative' act is not fatal, then, to an act of state claim. If the foreign state has exercised a sovereign power either to act or to refrain from acting, there is an act of state."

The situation in *Dunhill* contrasts sharply with the instant one. The *only* evidence of an act of state in *Dunhill* was the non-pay-

ment by the interventors of Dunhill's claims and the denial of liability by the Cuban attorneys. In the present case an act of state is evident in the record. The presidential decrees created the commissions for the specific purpose of determining the claimants entitled to indemnification and to provide for it. It was the functioning of the commissions within this area of their specific presidential authorization which resulted in their rejection of and failure to pay Papantla's claims. Mrs. Gaither does not say that the commissions did not examine the claims or that the Comision Global did not reject them. The record is undisputed that the commissions did both.[17]

Viewed in the light most favorable to plaintiff the record discloses that Gaither filed 576 claims on behalf of Papantla for indemnification with the Mexican commissions, that 7 of the claims were recognized and paid, and that the remainder were rejected. The failure of the commissions' records to contain written evidence of their rejections of the claims or their failure to give Gaither or Papantla written notice of their rejection may not comport with procedures and practices generally followed by administrative agencies of the United States. It does not follow that for this reason this Court should exercise its jurisdiction to adjudicate the claims and decide whether the Mexican government through its agent Pemex must pay them. Because the actions and nonactions of the Mexican commissions were acts of state this Court will not review them and attempt to correct errors, if any there were, in their procedures and decisions. It would be inappropriate and probably offensive or an affront to the Mexican government for it to do so. In fact, the Mexican government through its embassy in Washington has submitted a diplomatic note to the State Department which in effect asks the State Department to request this Court to abstain from continuing with the present action.[18]

If plaintiff seeks to obtain redress from the actions of the commissions he must resort to whatever channels, if any there are, available to him in Mexico. The fact that there may be none does not justify this Court exercising its jurisdiction in the matter.

The motion of the defendant for summary judgment will be granted.

## ON MOTION FOR REARGUMENT

Plaintiff's motion for reargument calls for several comments:

1. No "unambiguous agreement" was arrived at at the Bucareli Conferences. See discussion in Opinion of October 7, 1976. Plaintiff's argument that the "unambiguous agreement" rendered the expropriation decree ineffective so far as Papantla's rights were concerned, rests upon the fallacious assumptions that an "unambiguous agreement" was arrived at at the Bucareli Conferences. The letter dated September 13, 1976, to Mr. Bennethum from Mr. Rovine of the State Department (Exhibit A attached to the Ross affidavit of September 16, 1976, Doc. 127) states that the Bucareli meetings, although themselves not constituting an international agreement, nevertheless did give rise to two conventions which did become international agreements. These conventions as appears from Exhibit B attached to the Ross affidavit were known as the General Claims Convention and the Special Claims Convention. Plaintiff has conceded that both of these conventions are irrelevant to the instant case. (Transcript dated September 17, 1976, pp. 27–28, Doc. 128).

17. Acosta affidavit dated March 9, 1976 (Doc. 115B, Exhibit 5).

18. Affidavit of Sr. Flores, Minister Counselor of the Embassy of the United Mexican States dated April 12, 1976 (Doc. 115A, Exhibit 4). This note was filed to request the United States to grant sovereign immunity to the government of Mexico in the present suit. The record fails to show that this request was acted upon one way or the other by the State Department. Defendant, in its motion for summary judgment, has reserved the right to plead sovereign immunity if the State Department should act favorably upon the request of the Mexican government.

2. Plaintiff asserts that the specific procedure and notice required by the Mexican constitution of laws were not complied with in the case of Papantla. Plaintiff points to no provision of either which mandated the giving of notice to Papantla and the other holders of royalty and participating interests in the confirmatory concessions held by the oil companies. It is an uncontroverted fact that the expropriation decree was published in the official gazette and personal notice thereof was given to the 17 oil companies named in the decree as required by the expropriation law of 1936. That law did not require that notice be given to those whose rights were extinguished "as a consequence or result of the taking" but only with respect to those whose property was stated to have been expropriated. (Responses to Supplemental Interrogatories Directed to Defendant 17(c)(1)A, Doc. 104, p. 14). In any event this Court may not inquire into the validity of the expropriation decree under the law of Mexico since the expropriation is an act of state. Cf. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 415, fn. 17, 84 S.Ct. 923, 11 L.Ed.2d 804 (1963).

The 17 oil companies which were the subject of the decree were deprived by it of ownership of all of their real and personal property. Among the items of personal property affected by the decree were the rights of the companies to explore and exploit the oil in the subsoil which was derived from their concessions originally issued in their name or assigned to them by the surface owners. The case of *Tenex, S. A.* Judicio de Amparo, No. 6204/58/2a dated January 18, 1960, decided by the Supreme Court of Justice of Mexico, held that the decree deprived Transcontinental[19] of the confirmatory concessions held by it and of the rights inherent therein. The Court recognized that the obligations of the oil companies to third parties had not been expropriated but stated that nevertheless they were extinguished because compliance by the oil companies with their obligations to pay royalties had become legally impossible of fulfillment because of the expropriation of their concessions. (Doc. 104, p. 15). The opinion of the attorney general of Mexico which is discussed in the Opinion of October 7, 1976, coincides identically with the holding by the Supreme Court of Justice of Mexico in *Tenex, S. A.*

3. *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942) may be factually distinguishable, as plaintiff asserts, but the principle established by it is applicable to the facts of the instant case.

Plaintiff's motion for reargument will be denied.

---

**19.** Transcontinental was not a company named in the expropriation decree but was an oil producing Mexican subsidiary or affiliate of Suasteca Petroleum Company, the latter of which was named in the decree. See letter dated October 20, 1967, from Arthur G. Connolly, Jr. and letter dated November 3, 1976, from William H. Bennethum, both of which were addressed to the Court in response to the Court's letter to them dated October 18, 1976. (Doc. 132).