PHOENIX CANADA OIL COMPANY LIMITED, Plaintiff,

v.

TEXACO, INC., Gulf Oil Corporation, Texaco Petroleum Company and Ecuadorian Gulf Oil Company, Defendants.

Civ. A. No. 76–421.

United States District Court, D. Delaware.

April 10, 1978.

Joseph A. Rosenthal, Morris & Rosenthal, Wilmington, Del., for plaintiff; Edward Nathan, New York City, of counsel.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants; Milton J. Schubin, David F. Ryan and Daniel E. Lazaroff, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Should this case be resolved in the District of Delaware or rather in the nation of Ecuador? After resolving lesser questions and reducing to the nub the sea of papers and rhetoric directed at the Court, that is the essential question that must be confronted in the matter now at bar.

Plaintiff is a Canadian corporation maintaining offices in Toronto, Canada and New York City and trading its shares on the Montreal Stock Exchange and the over-the-counter market in the United States. Defendants are two major international oil and gas companies and their wholly-owned subsidiaries through which they transact business in Ecuador. Three of the four defendants are incorporated in Delaware;

defendant Gulf Oil Corporation ("Gulf") is a Pennsylvania corporation qualified to do business in Delaware and maintaining a registered agent within the state. Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.

Defendants have filed two motions:[1] (1) a F.R.Civ.P. 41(d) motion to stay all proceedings pending payment by plaintiff of defendants' costs incurred in a previous action taken by plaintiff against defendants in another jurisdiction and subsequently dismissed by plaintiffs; and (2) a F.R.Civ.P. 12 motion to dismiss the Complaint.[2] The latter motion is predicated upon three theories: (1) forum non conveniens; (2) act of state and foreign governmental compulsion; and (3) lack of sufficient nexus to the facts for defendants Gulf and Texaco, Inc. ("Texaco") to be sued.

## I. *Rule 41(d) Motion*

This suit in large part concerns rights relating to and deriving from oil exploration and production in Ecuador. On June 23, 1975 plaintiff filed a similar complaint against the same four defendants in the Southern District of New York. On September 17, 1975, defendants moved to dismiss the New York action under the doctrines of act of state and forum non conveniens. The New York motion to dismiss was essentially the same as that in the matter *sub judice.* Plaintiff argued that discovery was necessary to respond to defendants' motion.[3] The United States District Court for the Southern District of New York ruled on September 22, 1976 that plaintiff did not require discovery with respect to certain of defendants' "threshold defenses" and directed plaintiffs to file answering papers to those defenses.[4] On October 1, 1976, plaintiff voluntarily dismissed the New York action pursuant to F.R.Civ.P. 41(a)(1) and thereafter filed this action on November 26, 1976.

F.R.Civ.P. 41(d) provides:

*Costs of Previously Dismissed Action.* If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the action until the plaintiff has complied with the order.

Defendants contend that refiling the action in the Delaware district subsequent to the New York dismissal constitutes "blatant forum shopping" by plaintiff to which rule 41(d) "was designed specifically to provide a deterrent."[5] Accordingly, defendants request the Court to stay all proceedings pending payment by plaintiff of defendants' costs in the New York action, including attorneys' fees.

Plaintiff explains the action was dismissed in New York and recommenced in Delaware to remove antitrust claims in the prior action so as to "reach the merits more quickly and in order to avoid side issues concerning jurisdiction, venue, and plaintiff's standing under the antitrust laws."[6] It urges that a rule 41(d) stay cannot be granted in a second action unless costs were awarded in the similar first action, and no costs were awarded in the New York action in this case. It then argues that with respect to costs attorney's fees are the key issue and such fees properly are not granted

1. Doc. 7.

2. Additionally, defendants sought a stay of all discovery pending resolution of the rule 12 motion. Discovery has not proceeded since oral argument.

3. The parties dispute, or at least characterize in vastly divergent terms, the amount of discovery that would have occurred. Plaintiff claims that it needed "limited discovery as to matters arising from defendants' motion," while defendants assert plaintiff requested "a massive program of document production and depositions." *Compare* Doc. 13, at 43 *with* Doc. 10, at 6.

4. The Opinion of Judge Charles M. Metzner may be found in [1976] Trade Reg. Rep. (CCH) ¶ 61,093 (S.D.N.Y. Sept. 22, 1976).

5. Doc. 10, at 7–8.

6. Doc. 13, at 44.

under rule 41(d) without evidence of forum shopping, "which is not the case here whatsoever."[7] Finally, plaintiff claims financial hardship impairs payment of these costs "at this time," and that defendants not only are aware of the financial problems but are "the major cause of them."[8]

Rule 41(d) confers broad discretion upon the federal courts. 5 *Moore's Federal Practice* ¶ 41.16, at 41–224 (citing cases). The rule is permissive in nature and does not require an automatic stay. *Clemens v. Central R.R. Co.*, 264 F.Supp. 551 (E.D.Pa. 1967), *rev'd on oth. grds.*, 399 F.2d 825 (3d Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). The object of the rule is to prevent vexatious suits and secure the payment of costs, but a court will be reluctant to stay an action brought in good faith, especially when a plaintiff financially is unable to pay the former costs. *Moore's Federal Practice, supra*, at 41–225.

Guidance is provided by two precedents from within this circuit. In *Gainey v. Brotherhood of Railway & S.S. Clerks*, 34 F.R.D. 8 (E.D.Pa.1963), the district judge granted a stay until previously assessed costs were paid. Upon reflection, four factors appear to have influenced the *Gainey* decision: (1) costs had been assessed by the judge in the prior action; (2) the parties to both actions were the same; (3) no showing of financial inability was made; (4) the likelihood of plaintiff's success in the second suit was small. Focusing on the latter three criteria, Judge Higginbotham in *Clemens, supra*, decided against issuance of a stay. Although the parties to the actions were the same, and although the judge in the previous action had assessed costs, the court concluded that financial circumstances and the potential for success were such that a stay would be inappropriate. Finally, that district court noted it was not convinced plaintiff was engaged in vexatious litigation. 264 F.Supp. at 563.

It is concluded after applying these criteria and exercising discretion a stay will not be ordered, even though one criterion is fulfilled in that the parties to both actions are identical. First, costs were not assessed in the previous action. Although there was no opportunity for such an assessment because plaintiff effectuated a voluntary dismissal under rule 41(a), plaintiff cannot be said to have defaulted on a preexisting legal duty of payment.

Next, the declaration of financial inability in the matter *sub judice* is at least comparable to that deemed material in *Clemens, supra*.[9] Plaintiff has indicated that this lawsuit and the royalty interest at issue in the suit are its principal assets.[10] Plaintiff also claims it "could not, without substantial difficulty, raise sufficient funds to pay costs at this time."[11] Further, plaintiff asserts defendants are a major contributor to the financial problems. In light of these representations, the Court is loathe to mandate a stay.

With respect to the final criteria isolated from *Gainey*, at this time no judgment can be made concerning the likelihood of plaintiff achieving success on the merits. The Court is not prepared to say that the voluntary dismissal of the New York action indicates that plaintiff has no chance for success in this action. Moreover, the purpose

---

7. Doc. 20, at 62 (Transcript of oral argument of Sept. 12, 1977).

8. Doc. 13, at 44.

9. *Clemens* was a class action in which the sum of costs when divided among the class amounted to less than $2.50 per person. The district court nonetheless declined to order a stay, reasoning that the class members were retired persons living on small pensions and that staying the action pending payment of costs would reduce plaintiffs' chances of receiving any compensation to which they might be entitled. 264 F.Supp. at 563.

10. Plaintiff's brief asserts: "Plaintiff has alleged in the complaint that the royalty interest and this lawsuit are its principal assets." Doc. 13, at 44. The Complaint states: "At all times material to this Complaint, plaintiff's sole income-producing assets and operations consisted of its Ecuador gross royalty interests." Doc. 1, at 2.

11. Doc. 13, at 44.

of this action does not appear to be to vex or oppress defendants. Given plaintiff's alleged financial circumstances, such a proposition appears intrinsically dubious.[12]

For all these reasons, a stay will not be entered pending payment of costs. Additionally, many of the same factors, and others, lead one to conclude that to award costs for the New York action presently would be improvident. The potential financial hardship and the absence of evidence of bad faith in the bringing of this suit[13] weigh heavily against a cost assessment. Moreover, at oral argument, defendants represented that they are "not making a major issue" of plaintiff's inability to pay attorneys' fees.[14] Given this representation and that the remaining costs would probably not be substantial,[15] costs will not be assessed for the prior action as a precondition to permitting plaintiff to go forward at this time.

Finally, as an exercise of discretion and to assure complete fairness, should plaintiff ultimately succeed on the merits in this action, defendants will be permitted to work up a bill of costs for the prior New York action and to submit the bill to the Court. To the extent approved, those costs

will serve as a setoff against whatever recovery plaintiff receives. *Cf. Gainey, supra,* 34 F.R.D. at 11 (discussing an earlier case in which a setoff was approved).

Defendants' motion pursuant to rule 41(d) will be denied except to the extent specified in the preceding paragraph.

## II. *Rule 12 Motion*

### A. *Background*

In 1961, Minas Y Petroleos del Ecuador ("Minas"), a wholly owned subsidiary of Norsul Oil and Mining, Ltd. ("Norsul"), obtained a concession contract from the government of Ecuador for the exploration, development, and marketing of petroleum and natural gas deposits in Oriente Province.[16] Minas agreed to pay a royalty on each barrel of oil produced, to make substantial investments for development of the concession area, and to construct a pipeline and other facilities. Subsequently, Minas realized that it could not fulfill the financial and exploration requirements of the 1961 concession contract. As a consequence, in 1963 Norsul entered into an agreement with plaintiff under which plaintiff acquired a fifty percent interest in Mi-

---

**12.** As understood, plaintiff's explanation for the New York dismissal is that the Delaware suit eliminates antitrust claims and consequently obviates various time consuming preliminary issues under the antitrust laws. Although this reason is superficially plausible, it is not readily apparent why amendment of the New York complaint would not have accomplished the same result.

**13.** The Court notes defendants' argument that the burden of proof is upon plaintiff to show the second action is not vexatious. Doc. 10, at 40 n.*. Plaintiff has made a sufficient showing to fulfill the minimal burden. Given the alleged relative economic capabilities of the parties, defendants have not succeeded in overcoming plaintiff's minimal showing. To the extent defendants believe plaintiff seeks to relitigate matters already decided in the New York action, *see* Doc. 18, at 29–30, they may demonstrate to the Court at the proper time that those matters previously have been resolved. In another context, a plaintiff has been denied a second opportunity to litigate a matter already decided. *Pastewka v. Texaco, Inc.,* 420 F.Supp. 641 (D.Del.1976), *aff'd* 565 F.2d 851 (3d Cir. 1977).

**14.** The complete statement is: "I've read Plaintiff's statement that they couldn't afford to pay attorneys' fees. And I'm not making a major issue of that." Doc. 20, at 28.

Apart from this representation, a serious question exists whether attorneys' fees may be considered as costs of the first action, particularly where no costs were awarded by the judge in the first action. Defendants cite *Eager v. Kain,* 158 F.Supp. 222 (E.D.Tenn.1957), to support the proposition that attorneys' fees may be included. Plaintiff counters that the *Eager* language specified by defendants is dictum and that attorneys' fees were denied in the more relevant precedent, *Yetter Homes v. Coastal Cabinet Works,* 234 F.Supp. 568 (E.D. S.C.1964). *Compare* Doc. 13, at 42 n.* *with* Doc. 10, at 38–39. The Court presently declines to attempt to resolve this question.

**15.** *See* Doc. 20, at 28.

**16.** Oriente Province, the easternmost province in Ecuador, is mountainous in nature and about 300 miles from the shore.

nas in exchange for providing technical assistance and funds to defray preliminary exploration and maintenance costs.

In 1965, with the subsequent approval of the government of Ecuador, Minas on behalf of plaintiff and Norsul entered into a written agreement with the Ecuadorian operating subsidiaries of defendants Texaco and Gulf, the predecessors of defendants Texaco Petroleum Co. ("Texaco Ecuador") and Ecuadorian Gulf Oil Co. ("Gulf Ecuador"). The subsidiaries were assigned the rights to develop a portion comprising approximately fifteen percent of the concession area in sole exchange for the assignor (Minas) reserving a two percent gross royalty interest in crude oil production from the assigned area.

Early in 1969, defendants publicly announced their first oil discovery in the concession area. Ensuing reports within trade circles indicated that the amount of reserves within the concession area were very substantial.

The information heretofore related does not appear to be seriously disputed by the parties. From this point onward, however, the parties' versions are at variance. For purposes of evaluation, the succeeding account is derived largely from the Complaint. Plaintiff claims defendants committed acts and omissions giving rise to three legal theories of recovery: (1) breach of contract; (2) unjust enrichment; and (3) intentional infliction of economic distress. As related by plaintiff, the facts justifying legal recovery on these grounds are as follows.

Defendants are alleged to have starting in 1969 and continuing to the present "agreed upon, developed and implemented plans, schemes and a conspiracy to eliminate or impair plaintiff's gross royalty interest, to destroy plaintiff as a going concern, to remove plaintiff as a competitor in Ecuador and elsewhere and to reap whatever financial benefits would flow therefrom . . .." [17] The alleged objective of defendants was either to reduce or eliminate the royalty interest or to enable the conversion by the Ecuadorian government of the royalty interest into taxes which could be credited on United States income tax returns.[18]

Proceeding roughly in chronological order, plaintiff first avers defendants falsely and misleadingly claimed a discovery well was not located in the concession area and not subject to the two percent royalty.[19] This matter was resolved after Norsul instituted a declaratory judgment action in federal court in New York by stipulation that the well was within the assigned area and Minas and its successors and assigns were entitled to a two percent royalty.[20] Plaintiff claims the publicity surrounding the incident caused it harm in the financial market.

In 1971, plaintiff and Norsul each obtained an individual one percent royalty interest from Minas. Plaintiff avers that defendants subsequently, for the purpose of harassing and financially and physically wearing down plaintiff's and Norsul's resources, began to request documents purportedly to establish right and title to the gross royalty. Plaintiff asserts that providing the "unnecessary documents" and attending meetings caused harm and that defendants were at all times fully aware of the validity of the royalty.[21]

In 1972, a military government obtained power in Ecuador, replacing an elected civilian administration. Allegedly, at this point defendants falsely and maliciously began to publicly attack the original 1961 Minas concession agreement, terming it "piratical." [22] Later in 1972, defendants com-

---

17. Doc. 1, at 8.

18. *See* Doc. 13, at 18.

19. This claim allegedly was made knowingly and with the foreseeable effect of injuring plaintiff's business.

20. Doc. 16, at D–1.

21. Doc. 1, at 10.

22. *Id.* 11.

menced royalty payments to the government of Ecuador based on a new "reference price" which was set pursuant to a Hydrocarbons Law established by Ecuador in October 1971. Plaintiff claims at that time it was entitled to receive its gross royalty payment for the third quarter of 1972, as well as an accounting statement, but that neither was received when due. Thereafter, a series of delays and extensions was allegedly forced upon plaintiff under "implied threat." [23] Meetings were held and further delays were requested with respect to subsequent payments. Some delays were granted, but in at least one case plaintiff asserts it agreed to no delay.[24] In early 1973, a new agreement was made, defendants allegedly having "extracted plaintiff's consent to the . . . agreement and to repeated payment delays by economic duress." [25]

Allegedly, soon after the 1973 agreement, "substantially all of defendants' senior officials and employees charged with defendants' Ecuador affairs traveled to Quito, Ecuador to make further plans for the impairment of plaintiff's gross royalty interest and the destruction of said interest and therewith of plaintiff's business. During this period, defendants continued to fail and refuse to make any gross royalty payments to plaintiff." [26]

On February 26, 1973, plaintiff states it was advised by a Texaco official that gross royalty payments would be withheld until "further notice." [27] The ensuing publicity allegedly harmed plaintiff in the business community. Thereafter, on May 29, 1973, the Ecuadorian government issued a decree imposing a retroactive 86% withholding tax exclusively on plaintiff's and Minas' royalty interest. Plaintiff claims that it was harmed by defendants because even though this tax would have reduced the amount of its royalty interest after 1972, it was deprived of the carrying value of the money it would have received if defendants had paid

the royalty properly. Plaintiff further declares its other investments in other countries were impaired due to the destruction in financial credibility and capability defendant allegedly caused.

In August 1973, a contract was formed between the Ecuadorian government oil company ("CEPE") and defendants Texaco Ecuador and Gulf Ecuador. The contract granted CEPE the option to acquire up to twenty-five percent of these defendants' oil production rights in exchange for a negotiated consideration. The option was exercised by CEPE in June 1974. Despite demands by plaintiff, defendants since that time allegedly refuse to pay plaintiff twenty-five percent of gross royalties due or pay plaintiff a share of the funds derived from the sale to CEPE. Finally, plaintiff declares that subsequent to 1973, "defendants have threatened plaintiff that they intended not to make any further gross royalty payments nor to furnish further accounting statements." [28]

Although the above is not complete, the account fairly reflects plaintiff's allegations. In sum, plaintiff urges the 1965 agreement was breached by failure and refusal to make timely payments, make full payments, deposit the payments in the proper place, and render proper accounting statements. The unjust enrichment claim is predicated on plaintiff's failure to receive a royalty or share of the monies garnered by defendants from the CEPE twenty-five percent acquisition. Finally, the theory of intentional infliction of economic distress is asserted as a catchall label for the alleged tortious acts of defendants relating to the supposed embarkation on an alleged plan to weaken or destroy plaintiff in order to reduce or eliminate the royalty burden.

### B. *Forum Non Conveniens*

### 1. *Procedure*

■ Before endeavoring to elucidate the facts pertinent to defendants' forum non

**23.** *Id.* 12.

**24.** *Id.* 13.

**25.** *Id.*

**26.** *Id.* 15.

**27.** *Id.*

**28.** *Id.* 23.

conveniens motion, the Court must first determine whether consideration of the parties' affidavits and appended copious exhibits may convert the motion into a summary judgment action pursuant to F.R.Civ.P. 56. The possibility of conversion was raised at oral argument and plaintiff responded "our opinion has been all along this is essentially a motion for summary judgment." [29]

To the extent a problem is posed, it results from the failure of defendants to delineate under which subsection of rule 12 this motion is brought. *See Mortensen v. First Federal Sav. & Loan Ass'n,* 549 F.2d 884, 890 (3d Cir. 1977). Conversion to a summary judgment motion occurs when resolution of a rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted depends upon matters outside of the pleadings. *See Moreland v. Western Pennsylvania Interscholastic Athletic League,* 572 F.2d 121 (3d Cir. 1978); 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1366 (1969). As noted by defendants, however, the present motion pertains to dismissal on jurisdiction or discretionary jurisdiction grounds.[30] Although not so labelled by defendants, the action apparently is brought pursuant to rules 12(b)(1) and/or (3). Defendants argue that in connection with this type of motion a court can evaluate factual matters without converting the motion to summary judgment, citing *Land v. Dollar,* 330 U.S. 731, 735 n.4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130–31 (2d Cir. 1976); and *Alabama v. Woody,* 473 F.2d 10, 12 (5th Cir. 1973).

The correctness of defendants' argument was recognized by the Third Circuit in an antitrust context in *Mortensen, supra.* Speaking of a rule 12(b)(1) motion which attacks jurisdiction in fact and not merely on the pleadings, Judge Hunter noted:

Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

549 F.2d at 891 (footnote omitted). Essentially the same holds true for a motion under rule 12(b)(3). C. Wright & A. Miller, *supra,* § 1352.[31] It is concluded to the extent the motion is predicated on forum non conveniens it should not be treated as a motion for summary judgment.

Finally, the manner of inquiry adopted by the district court is quite flexible. "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs v. Buck,* 307 U.S. 66, 71–72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939).

### 2. *Merits*

■ "A district court may in the interest of justice decline to pass upon the merits of a controversy and relegate the plaintiff to a more appropriate forum." *Hoffman v. Goberman,* 420 F.2d 423, 426 (3d Cir. 1970). "The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). The doctrine "involves the dismissal of a case because the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else." *Norwood v. Kirkpatrick,* 349 U.S. 29,

---

**29.** Doc. 20, at 65.

**30.** *Id.* 66.

**31.** *See Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 645 (2d Cir.), *cert. denied,* 352 U.S.

871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). "[I]n the determination of a motion to dismiss for *forum non conveniens,* the court may consider affidavits submitted by the moving and opposing parties."

31, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955), quoting with approval *All States Freight v. Modarelli,* 196 F.2d 1010 (3d Cir. 1952). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert, supra,* 330 U.S. at 508, 67 S.Ct. at 843. "[W]here as here, the plaintiff elects to sue the defendant in the latter's district of residence, his choice should be disturbed only upon a strong showing that it is required by the balance of convenience." *Daquila v. Schlosberg,* 102 U.S.App.D.C. 366, 367, 253 F.2d 888, 889 (1958); *see* Annot., 10 A.L.R. Fed. 352, 377 (1972).

"Each case turns on its own particular facts, but the ultimate inquiry is whether the retention of jurisdiction by the district court would fairly serve the convenience of the parties and the ends of justice." *Hoffman, supra,* 420 F.2d at 426 (footnote omitted). The classic statement of the criteria to be considered in evaluating a forum non conveniens motion was articulated by Justice Jackson in *Gilbert, supra,* 330 U.S. at 508–09, 67 S.Ct. at 843 (footnote omitted):

> An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility *[sic]* of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. . . .

> Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litiga-

tion. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

Assuming without deciding that Ecuadorian law will govern at least the breach of contract claim, the record thus far compiled does not favor depriving plaintiff of its chosen forum. This conclusion particularly is compelled by the realization that plaintiff has ceded defendants the "home turf" advantage and that in light of the relative economic capabilities of the parties plaintiff can hardly be said to "vex," "harass," or "oppress" defendants by the bringing of this suit.[32]

Turning first to the Ecuadorian interest in adjudicating this suit, defendants assert: (1) Ecuador has a vital interest in management of its petroleum resources and the maintenance of a "single legal regime"; (2) a governmental minister in Ecuador has already construed the 1965 contract three times and a ruling in favor of plaintiff might result in caducity (premature termination of concession rights) for defendants; (3) the agreement was made in Ecuador, between Ecuadorian citizens, to be carried out in Ecuador; (4) Ecuador can act to secure compliance with its law; (5) numerous documents written in the Spanish language may be relevant to the action.

Upon evaluation, these averments are largely untenable. Plaintiff concedes a vital interest on Ecuador's part in control of its natural resources; plaintiff rightly questions how that interest is impaired by judicial interpretation of a private royalty interest Ecuador allegedly already has recog-

**32.**  *See Gilbert, supra,* 330 U.S. at 508, 67 S.Ct. 839.

nized as valid. Further, plaintiff represents it "is not challenging any rulings or decrees of the Government of Ecuador and is not attempting to resubmit any of these matters for further adjudication by this Court."[33] Admitting arguendo the agreement here in question was made in Ecuador, this hardly constitutes a sufficient independent reason for dismissal, especially when the point applies only to breach of contract and not necessarily to the other theories of recovery alleged.

With respect to the asserted ability of Ecuador to secure compliance with its law, this too is subject to legitimate challenge. First is the matter of personal jurisdiction. Plaintiff states by way of affidavit that three of the four defendants to this action might not be subject to judicial compulsion in Ecuador.[34] Thus, at a minimum, this Court would have to condition a dismissal upon defendants submitting to Ecuadorian jurisdiction.[35] But the record suggests that even if jurisdiction existed and plaintiff received a verdict in Ecuador, defendants perhaps could not be penalized effectively. Presumably, the only legal device for enforcing ministerial government decisions in Ecuador is caducity, and Ecuador allegedly could not impose this remedy upon defendants because of its economic dependence upon them.[36]

Finally, the recitation of various Spanish language documents appears largely misplaced. The relevance of numerous of the mentioned documents is dubious. Moreover, it has been resolved beyond peradventure that courts in this country possess the capability to try cases dependent upon documents written in other languages and that such a factor is not sufficient independent cause for a forum non conveniens dismissal.[37] Even if that were not generally the case, Spanish is hardly an obscure and abstruse language that would provide extreme difficulty in obtaining accurate translations.

When compared against potential ties to the United States, the asserted Ecuadorian interests fail to tip the balance in favor of a forum non conveniens ruling. Plaintiff asserts in an affidavit a whole series of contacts between this action and the United States.[38] The more salient ones include: (1) the alleged Ecuadorian propaganda campaign and acts of harassment against plaintiff were directed by defendants in the United States; (2) difficulties with respect to documentation of royalty rights were resolved by negotiations and correspondence in the United States; (3) the payment for the twenty-five percent CEPE acquisition in oil production was made to defendants Gulf Ecuador and Texaco Ecuador in the United States. The Court is unwilling to conclude these ties alone outweigh the Ecuadorian interest; indeed, the conclusion must be they do not.

**33.** Doc. 13, at 47.

As a matter of interest but not as a controlling factor, it is noted that although defendants presently claim all aspects of Ecuadorian oil production should be regulated in Ecuador, plaintiff has submitted an affidavit showing that defendants were not unwilling to bring suit in the United States in a matter involving oil rights in which an Ecuadorian government minister interceded. Doc. 14, at 5–6. *See Ecuadorian Gulf Oil Co. v. Atlantic Richfield Co.,* 73 F.R.D. 99 (C.D.Cal.1976).

**34.** Doc. 14, at 4.

**35.** *See Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 449 (2d Cir. 1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976).

**36.** Doc. 14, at 4.

**37.** *See D'Angelo v. Petroleos Mexicanos,* 398 F.Supp. 72, 85 (D.Del.1975):

The fact that the success or failure of plaintiff's case depends upon the law of Mexico does not, of itself, justify a dismissal. There may be difficulties in attempting to determine and apply foreign law but the rules of the foreign law and their interpretation are simply questions of fact and involve difficulties no different from those which the federal courts sometimes experience in attempting to determine the law of other state jurisdictions. *Burt v. Isthmus Development Co.,* 218 F.2d 353, 357 (5th Cir. 1955), *cert. denied,* 349 U.S. 992, 75 S.Ct. 661, 99 L.Ed. 1254. The interpretation of the law of a foreign country is a task from which federal courts do not shrink. *Lesser v. Chevalier,* 138 F.Supp. 330 (S.D.N.Y.1956).

**38.** Doc. 14, at 6–7.

But when the public and private interests in assuring a fair trial are evaluated, the balance convincingly favors proceeding in the United States. First and foremost, it is not at all clear that Ecuador represents an acceptable alternate forum. "[A] prerequisite to dismissal under the doctrine of *forum non conveniens* is the existence of an alternative forum where plaintiff can litigate his claims." *Wan v. Avis Rent A Car System, Inc.,* No. 75–28 (D.Del. Jan. 20, 1976) (Memorandum Opinion) (footnote omitted). "[T]he action will not be dismissed unless a suitable alternative forum is available to the plaintiff." *Restatement (Second) of Conflict of Laws* § 84, Comment c (1971). "That there is an alternative forum that will take jurisdiction of the case and where plaintiff can get the relief he would get in the federal court must clearly appear before dismissal can be ordered." C. Wright, *Law of Federal Courts* 186 n. 23 (1976) (citing cases). "Limitation upon or denial of recovery is in and of itself grounds for *not* dismissing on *forum non conveniens* grounds." *Fitzgerald v. Texaco, Inc., supra,* 521 F.2d at 458 (Oakes, J., dissenting).

That the Third Circuit Court of Appeals believes the existence of a suitable alternative forum to be critical is boldly demonstrated in this passage from *Mobil Tankers Co. v. Mene Grande Oil Co.,* 363 F.2d 611, 614 (3d Cir.), *cert. denied,* 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966):

> The issue of convenience aside, the more important question is whether the relinquishment of jurisdiction would best serve the ends of justice. The court below seemed to think that it would, but with this we cannot agree. There is no

evidence in the record that the retention of jurisdiction would seriously prejudice [defendant]. However, the relinquishment of jurisdiction could result in serious detriment to [plaintiffs'] causes of action. It would relegate the libellants to a foreign forum [Venezuela] in which the procedural remedies are far less conducive to the fair administration of justice than those available under our admiralty rules. The mode of trial, the lack of adequate pre-trial procedures, and the limitation on the manner in which expert testimony may be offered do not comport with our concepts of fairness.

Thus the Third Circuit has apparently endorsed the concept that not only must an alternate forum exist, and not only must that forum provide relief for the actions alleged to violate United States law, but the alternate forum must also provide comparable procedural protections to those in the United States.[39] This Court needs not hold as much. Sufficient doubt arises with respect to the existence of an alternative forum and the availability of relief for the alleged actions to justify a decision not to dismiss the case without resort to a comparison of alternate procedural safeguards.[40]

Plaintiff has represented by affidavit that Ecuador is presently controlled by a military government which has "assumed the power of the executive and legislative branches and rules by fiat," "has specifically retained the right to veto or intervene in any judicial matter which the Military Government deems to involve matters of national concern," and "has absolute power over all branches of government."[41] The

---

**39.** The *Mobil Tankers* language appears somewhat broader than the approach subsequently taken by the Third Circuit in *Hoffman v. Goberman, supra,* 420 F.2d at 428:

> The plaintiff also contends that an action may not be dismissed unless the defendant proves, and the court expressly finds, that there is a second forum available to the plaintiff in which he may obtain substantially identical relief. He argues that the Netherlands Antilles is not such a forum since its courts are not empowered to entertain a suit on a contract dispute between him and the defendant or to grant him the equitable relief

> to which he asserts he is entitled. We need not decide this question, however, but the doubt which it raises as to the existence of an adequate second forum adds weight to the plaintiff's argument against dismissal here.

In the *Hoffman* decision, the Third Circuit twice cited *Mobil Tankers,* expressing no disapproval of the case.

**40.** It is noted plaintiff represents that procedural protections under Ecuadorian law are scant. Doc. 14, at 3.

**41.** Doc. 14, at 2.

status and powers of the judiciary are thus allegedly "uncertain." [42]

Assuming a decision on the merits of this dispute could be obtained in Ecuador, and further assuming this Court would condition any dismissal for forum non conveniens on the willingness of all defendants to concede Ecuadorian jurisdiction, there still is no assurance that the Ecuadorian justice system would consent to accepting jurisdiction over defendants it otherwise might not be able to reach because of jurisdictional limitations in Ecuadorian law. As stated by the Supreme Court in *Gilbert, supra,* 330 U.S. at 506–07, 67 S.Ct. at 842: "In all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process . . . ." As previously rehearsed, Ecuador might not be able to obtain jurisdiction over three of the four defendants.[43]

Also, plaintiff has asserted in its brief that sending "officers, witnesses, experts and documentary evidence to Ecuador would create a substantial hardship." [44] Given the aforementioned relative economic positions of plaintiff and defendants, the Court credits the representation that plaintiff conceivably could be seriously harmed by mere burden of travel and trial preparation.

Finally, even if an Ecuadorian tribunal will hear the case, jurisdiction is had over all defendants, and plaintiff financially is able to proceed in Ecuador, it appears that no generally codified Ecuadorian legal remedy exists for unjust enrichment or the tort claims asserted here.[45] Thus, this case may not simply be one in which a lesser remedy could be obtained elsewhere than in the United States, but rather one in which no remedy could be obtained for two of three legal theories advanced.[46]

Practical considerations also dictate United States jurisdiction. Defendants' offices and officers are located in the United States, as may be relevant records. No problem exists with enforceability of any judgment that might be obtained against defendants in this country. Defendants cite no docket problems of the District of Delaware or other administrative reasons to justify application of the forum non conveniens doctrine.

Defendants assert the circumstances of this case are remarkably similar to those in *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), where a dismissal based on forum non conveniens was granted. But *Vanity Mills* apparently involved only one basic theory of recovery, not three. In *Vanity Mills,* the Canadian justice system had already rendered certain decisions concerning the trademarks in is-

---

**42.** *Id.* 3. Plaintiff further argues the government minister who might hear the case is not competent to hear private party disputes over private contracts and defendants' propaganda campaigns have removed any chance for a fair hearing. Doc. 13, at 49.

**43.** Plaintiff represented in oral argument: "The Courts of Law in Ecuador specifically provide that they do not accept jurisdiction over foreign aliens in disputes which relate to the controversy which would have existed here. . . . There would be no possibility of Ecuador taking jurisdiction of this dispute." Doc. 20, at 75. Defendants countered that plaintiff did go to a government minister and present its position on this matter. *Id.* That allowing a presentation of a position before a governmental official is equivalent to taking jurisdiction over foreign defendants is unlikely.

**44.** Doc. 13, at 51.

**45.** This statement does not by implication indicate that "intentional infliction of economic distress" is a recognized claim in the United States, but merely that a remedy probably exists here for some of the alleged tortious violations placed under that heading. Defendants claim any such tort action is barred by the statute of limitations. Doc. 18, at 5. But that issue is not properly before the Court; defendants have made no motion to dismiss for failure to bring suit within the limitations period. *See* Doc. 20, at 13. The Court is not inclined in the present procedural setting to take judicial notice of a statute of limitations as suggested by defendants, *id.* 18, when the Complaint in this case asserts that the alleged conspiracy underlying the alleged tortious acts "continues to this day." Doc. 1, at 24.

**46.** *See* Doc. 14, at 3.

sue, and the Exchequer Court possessed exclusive jurisdiction to resolve the action in question. 234 F.2d at 646. That plaintiff could obtain a fair adjudication in Canada did not appear to be a subject of serious dispute; the Second Circuit examined the relevant Canadian law to assure existence of a legal remedy. The circuit court stated: "Were this merely a transitory tort action in which disputed facts could be litigated as conveniently here as in Canada, we would think the jurisdiction of the district court should be exercised. But we do not think it the province of United States district courts to determine the validity of trade-marks which officials of foreign countries have seen fit to grant." 234 F.2d at 647. In the case at bar, there is (1) an alleged connected tort action that can be litigated here; and (2) the absence of a clear issue under a developed body of foreign law hinging upon a previous determination under that foreign law. For these reasons, *Vanity Mills* is not dispositive of this action.

Defendants' other references to various scattered precedents also are not persuasive. Initially, it is emphasized forum non conveniens is a discretionary doctrine varying in application from case to case depending on the facts. For each case cited by defendants in which forum non conveniens was found, plaintiff offers an opposing precedent.[47] Defendants refer to *De Sairigne v. Gould,* 83 F.Supp. 270 (S.D.N.Y. 1949), *aff'd per curiam,* 177 F.2d 515 (2d Cir.), *cert. denied,* 339 U.S. 912, 70 S.Ct. 571,

94 L.Ed. 1338 (1950). The district court in that instance merely determined that a federal court does not have to allow an alien to sue in the United States; no averment was made that a federal judge cannot permit suit by an alien. Moreover, plaintiff in *Gould* had lesser ties to the United States than the present plaintiff which allegedly maintains a New York office and trades common shares in the United States.[48] All witnesses in *Gould* other than the parties resided in France. 83 F.Supp. at 272. Finally, plaintiff in *Gould* could obtain jurisdiction over defendant equally as well in France as in the United States. 83 F.Supp. at 273.[49]

Similarly unavailing is defendants' argument that "where the parties to a contract have stipulated to the adjudication of disputes in a particular foreign forum, that stipulation will be honored in the context of a forum non-conveniens motion."[50] Defendants' affidavits fail to disclose that the parties to this litigation have stipulated to any such thing; the reference made to a choice of forum clause pertains to concessionaires and defendants admitted at oral argument this lawsuit is not a disagreement among concessionaires.[51] Additionally, if a choice of forum clause does exist, albeit not in clearly defined terms, the Court might well have to determine whether it is reasonable under all of the circumstances surrounding this action. In the lead case cited by defendants on this issue, *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct.

---

**47.** *Compare* Doc. 10, at 50–52 *with* Doc. 13, at 61–63.

**48.** Doc. 1, at 2.

**49.** Defendants' other citations also are distinguishable. In *Fitzgerald v. Westland Marine Corporation,* 369 F.2d 499 (2d Cir. 1966), the district court did note the potential need to interpret both Japanese and Canadian law. But *Westland* involved three defendant corporations—one American, one Japanese, and one Canadian. Serious and perhaps insurmountable difficulties existed with respect to ease of access to sources of proof and the availability of compulsory process. Most if not all potential witnesses resided in Japan.

The citation to *Domingo v. States Marine Lines,* 340 F.Supp. 811, 816 (S.D.N.Y.1972), is unhelpful. Defendants make no showing of

administrative inconvenience comparable to that in *Domingo* and the potential connections to the United States are stronger here than in that case. The court in *Domingo* found clear jurisdiction over defendant in the relevant foreign nation and certain enforceability of judgment. Moreover, the *Domingo* court noted that the Delaware state courts had denied a forum non conveniens motion in an apparently related case instituted there. 340 F.Supp. at 817. *See Domingo v. States Marine Lines,* 253 A.2d 78 (Del.Super.1969), *aff'd,* 269 A.2d 223 (Del.1970).

**50.** Doc. 10, at 52.

**51.** Doc. 20, at 10. Thus the references in Doc. 9, at 5 are not persuasive on this point.

1907, 32 L.Ed.2d 513 (1972), the Supreme Court indicated such a clause could be disregarded if shown to be unreasonable. 407 U.S. at 10.[52]

Remaining is only defendants' assertion that principles of comity require this action to be litigated in Ecuador. To the extent United States jurisdiction "is fraught with possibilities of discord and conflict with the authorities of another country," *Vanity Mills, supra,* 234 F.2d at 647, and thus the appropriateness of this forum is called into doubt, the Court is unable to perceive how United States resolution of the claims here advanced causes any especial concern to the government of Ecuador. The Court perceives no vital national concerns in the private contractual royalty agreement allegedly at issue here; the unjust enrichment and tort claims may be even less consequential to Ecuador. All defendants are United States corporations; a United States court can enforce its judgment and achieve compliance. Thus, to the extent the criteria in *Restatement (Second) of Foreign Relations Law of the United States* § 40 (1965) are relevant, they do not tip the forum non conveniens balance in favor of defendants.

In sum, because the public interests of the United States and the private United States interests of the litigants far outweigh the Ecuadorian interest in this litigation, the Court will not dismiss this suit under the doctrine of forum non conveniens.

### C. *Act of State*

■ The preeminent explication of the act of state doctrine in American law is in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897): "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."[53] Although the principle is compelled by neither international law nor the Constitution,[54] it maintains vitality because of the deference of the judiciary to the other branches in matters concerning foreign affairs.[55] Act of state's primary application is to cases involving expropriation of foreign property owned by Americans.[56] The doctrine does not apply "to acts committed by foreign sovereigns in the course of their purely commercial operations."[57]

Defendants contend this doctrine is controlling in the matter *sub judice,* referring to Ecuadorian governmental rulings, decrees, and issuances and asserting that the Ecuadorian "Minister of Natural and Energy Resources has already authoritatively construed the 1965 Contract adversely to plaintiff."[58] Plaintiff responds: "Here, the complaint does not challenge the validity, application or purpose of any law of Ecuador. Plaintiff does not allege any injury was caused by government action, including the 86% tax and the 25% acquisition by CEPE. The complaint does not even charge the defendants with instigating government action."[59]

To the extent defendants urge the doctrine tips the forum non conveniens balance in favor of Ecuador, the Court believes the strong United States interests in this litiga-

---

**52.** See Restatement (Second) of Conflict of Laws § 80 (1971).

**53.** See Restatement (Second) of Foreign Relations Law of the United States §§ 41–43 (1965).

**54.** Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

**55.** Alfred Dunhill of London, Inc. v. Cuba, 425 U.S. 682, 697, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

**56.** E. g., First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); Sabbatino, supra.

**57.** Alfred Dunhill, supra, 425 U.S. at 706, 96 S.Ct. at 1867.

**58.** Doc. 18, at 27.

**59.** Doc. 13, at 72.

tion delineated in the preceding segment of this Opinion are by no means outweighed. To the extent act of state constitutes a separate basis for dismissal, plaintiff challenges not the various decrees and rulings defendants have specified but rather their effects. *See D'Angelo v. Petroleos Mexicanos,* 398 F.Supp. 72, 77 (D.Del.1975); 422 F.Supp. 1280 (D.Del.1976). With this question in substantial and presently unresolvable dispute, the motion for summary judgment [60] on the basis of the doctrine of act of state [61] will be denied.

### D. *Involvement of Gulf and Texaco*

■ Defendants argue that the Complaint does not allege a breach of contract claim against Gulf and Texaco but only against their subsidiaries, so that the Complaint should be dismissed with respect to the parent corporations. The Complaint, which "should not be dismissed for insufficiency unless it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim," *Scott v. Plante,* 532 F.2d 939, 945 (3d Cir. 1976); *Thomas v. Brierley,* 481 F.2d 660 (3d Cir. 1973) (per curiam), alleges that "defendants Texaco and Gulf have at all pertinent times acted on behalf of Texaco Ecuador and Gulf Ecuador," "at all times have so conducted themselves as to assert complete dominion and control and management over [their subsidiaries]," "to assume on behalf of themselves the benefit of rights and obligations accruing to [the subsidiaries]," and indeed the subsidiaries "have been and are mere alter egos of defendants Texaco and Gulf, respectively, and have been so treated by Texaco and Gulf." [62] It further is alleged that various meetings and negotiations with respect to contractual payments took place between plaintiff and the parent corporations.[63]

The Court has scant difficulty in denying the motion to dismiss. Whether the matter is analyzed in terms of agency and apparent authority to bind a principal, *William B. Tanner Co., Inc. v. Wioo, Inc.,* 528 F.2d 262 (3d Cir. 1975); *Reading Co. v. Dredge Dela-*

**60.** Unlike forum non conveniens, act of state is not a jurisdictional defense. Where the act of state doctrine is implicated, "rather than declining jurisdiction, a court is supposed to exercise its jurisdiction and decide a case on the merits, after according the foreign act an irrebuttable presumption of legality. *See, e. g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 471–72 [84 S.Ct. 923, 11 L.Ed.2d 804] (1964)." *Zweibon v. Mitchell,* 170 U.S.App. D.C. 1, 7 n.68, 516 F.2d 594, 620 n.68 (1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Because act of state is not jurisdictional, the motion to dismiss on this ground must be considered to have been made on the basis of F.R.Civ.P. 12(b)(6). Consideration of the affidavits relevant to this issue, *compare* Doc. 9 *with* Doc. 15, converts this part of defendants' motion to one for summary judgment pursuant to F.R.Civ.P. 56.

**61.** Defendants have also made reference to the doctrine of foreign governmental compulsion. Foreign governmental compulsion is related to act of state. The essence of the compulsion defense is that an act performed within a foreign country under the direct mandate of a foreign authority represents the de facto action of the sovereignty. Accordingly, the action is protected by the doctrines of act of state and sovereign immunity. *See* Graziano, Jr., *Foreign Government Compulsion as a Defense in United States Antitrust Law,* 7 *Va.J. Int'l L.* 100

(1967); Note, *Development of the Defense of Sovereign Compulsion,* 69 *Mich.L.Rev.* 888 (1971). The doctrine first became law in the United States within this District in *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,* 307 F.Supp. 1291 (D.Del.1970), in which it was held "a showing of bona fide compulsion by a foreign government immunizes an otherwise illegal boycott." 307 F.Supp. at 1297 n.14. The justification for the foreign governmental compulsion defense is that any harm suffered was caused by the sovereignty, not the party manipulated.

A ruling independent of act of state is unnecessary with respect to the compulsion defense. Plaintiff stated in its brief: "In reality the government of Ecuador did not compel the defendants to do any of the acts about which plaintiff is complaining." Doc. 13, at 68. The Court takes this to mean that to the extent defendants aver they were compelled to do certain things by the Ecuadorian government, those acts are not the ones about which plaintiff complains. Thus, as with act of state, the compulsion defense is in substantial unresolvable dispute at this time, precluding a present judgment in defendants' favor.

**62.** Doc. 1, at 20.

**63.** *Id.* 10–13.

*ware Valley,* 468 F.2d 1161 (3d Cir. 1972), or instrumentality theory in which acts of a subsidiary are charged to a parent, *Trent v. Atlantic City Electric Co.,* 334 F.2d 847 (3d Cir. 1964), the Complaint is sufficient to withstand facial attack.[64] Any challenge to the veracity of the facts alleged is not the proper subject of a rule 12 motion.

### E. *Conclusion*

The rule 12 motion to dismiss for forum non conveniens and the lack of involvement of defendant parent corporations Gulf and Texaco will be denied. Treating the rule 12 motion as a rule 56 motion for summary judgment with respect to act of state, the motion for summary judgment will be denied.

---

**64.** Thus the Court finds it unnecessary to evaluate plaintiff's affidavit on this point. *See* Doc. 15, at 23–26.